# EXHIBIT F

# Defendant's Appendix:

# Reply to Plaintiff's Statement of Genuine Disputes

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| F. RENEE MORRISON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CASE NO.: 1:18-cv-00374-WCL-SLC |
| v. | ) |
| | ) |
| FIFTH THIRD BANK, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT'S APPENDIX:
REPLY TO PLAINTIFF'S STATEMENT OF GENUINE DISPUTES**

Defendant, Fifth Third Bank ("Fifth Third"), by counsel, provides this Appendix to reply to inaccurate and unsupported statements in the Statement of Genuine Disputes filed by Plaintiff F. Renee Morrison ("Morrison"). (Dkt. 36-1.) Morrison's Statement of Genuine Dispute contains inaccuracies and omissions, which Fifth Third addresses to correct the record. Nonetheless, the discrepancies addressed below do not create a genuine dispute of material fact. Separately, Morrison's Statement of Genuine Disputes largely provides Morrison's narrative version of events, rather than present disputed facts that could preclude summary judgment. It also relies on speculation, hearsay, and a letter that lacks foundation. These issues are addressed separately in Fifth Third's Brief in Support of Motion to Strike. (Dkt. 46)

**I. Morrison Makes Several Inaccurate Statements in the Section Concerning Her Alleged Concerns About Racially Biased Treatment (Dkt. 36-1 at 4-7).**

Right off the bat, Morrison collapses three separate transfer opportunities into one instance. (Dkt. 36-1 at 4-5.) In February 2013, Morrison applied for the FCM position at the Lima Road branch. (Dkt. 33-3 at ¶ 5.) It was with respect to only this application that Milner allegedly used the word "fit." (*Id.* at ¶ 6.) Morrison applied to Dupont Road in Spring 2014, and when Morrison

was not selected, Milner explained that "some of the metrics [he] based the decision on were incorrect when [he] viewed them." (*Id.* at ¶¶ 8-9.) Later in 2014, the FCM position at Lima Road came open again, and Milner offered the position to Morrison, but she declined it. (*Id.* at ¶ 11; *but see* Dkt. 33-2 at 28 (Morrison Dep. 108:5-7) (Morrison claims she was given an "ultimatum" rather than a real offer.)) Conflating these separate applications only serves to confuse the issues.

Morrison's argument regarding Milner's reason for not transferring her to another branch contradicts her alleged contemporaneous recollection. According to Morrison's contemporaneous 2013 letter, Milner allegedly told Morrison, "'I cannot give you a single reason.'" (Dkt. 36-13.) There is a difference between not being able to distil a decision down to a single reason, and her claim now that "Milner could not give Morrison even one, a single, reason why." (Dkt. 36-1 at 4.) Similarly, she now claims Milner told her, "You don't fit," when Morrison's contemporaneous letter says he told her that he "selected a person who better fit the financial center." (*Compare* Dkt. 36-1 at 4 *with* Dkt. 36-13.) Morrison's assertion that she was "continually told that she 'did not fit,'" is not supported by the record, including the June 1, 2013, letter and Morrison's own testimony. (Dkt. 36-1 at 6; Dkt. 36-13 at 1.) Rather, her testimony is that he said it *once* in 2013 and they had since discussed what he meant by it. (*See* Dkt. 33-2 at 23-24, 29 (Morrison Dep. 116:9-13); Exhibit G to Supplemental Designation of Evidence, contemporaneously filed herewith, Morrison Dep. II (hereafter "Exhibit G") at 101:1-102:1, 127:12-129:22.)

Another issue is Morrison's claim that the transfers at issue would have been promotions. (Dkt. 36-1 at 5.) It is undisputed that at the downtown branch, she was an FCM II, and if she had moved to either of the other branches, she would have remained an FCM II or gone *down* to an FCM I. (Dkt. 33-2 at 30; Exhibit G at 126:2-129:22.) Rather, Morrison merely speculates she

2

would have been able to do more business, and therefore, achieve higher bonuses. (Exhibit G at 127:17-21.)

Finally, Morrison points out that Ferree and Swiergosz are white (Dkt. 36-1 at 7), but she omits that she testified she does not claim Swiergosz discriminated against her. (Exhibit G at 198:15 – 199:3.) And Morrison does not allege in her complaint or elsewhere that Ferree discriminated against her. (*See* Dkt. 4.) The mere fact that they are white does not advance her claims.

**II.     Morrison Overlooks the Account Opening Procedure Incorporates the Signature Card Procedures.**

With respect to Fifth Third's account opening procedure, Morrison claims the procedure "fails to mention anything about when, where, and how to get a customer's signature for a signature card." (Dkt. 36-1 at 10.) However, the signature card requires the customer to input more information than merely a signature, and the account opening procedure incorporates the signature card procedure, which provides detailed instructions on how to collect, verify, and input the various pieces of information, including the signature. (Dkt. 33-4 at 39; Dkt. 33-5 at 19-37.)[1]

**III.    Morrison Makes Several Inaccurate Statements Regarding Fifth Third's Conflict of Interest and Self-Dealing Policies.**

Regarding Conflict of Interest and Self-dealing policies, Morrison claims *she* did not receive any benefit, but the policies specifically prohibit actions that benefit a family member even if the actions would not benefit the employee. (Dkt. 33-5 at 13; Dkt.33-5 at 15.) Morrison tacitly acknowledges this distinction by citing to the example in the Employee Handbook involving an

---

[1] Notably, Morrison cites a three-page excerpt of the 19-page Signature Card Procedure. (*Compare* Dkt. 33-4 at 41-59 *with* Dkt. 36-7 at 1-3.)

3

employee doing something that benefits her family, putting her family members' interest in convenience above Fifth Third's interest in security. (Dkt. 36-1 at 12 (citing Dkt. 33-4 at 31); Dkt 36-6 (citing 33-5 at 15-17.)) Further, of course, the benefit to Morrison's family was that her adult daughter was easily added to her new husband's account outside of Fifth Third's policies and procedures, which made her a joint owner with immediate access to account funds. (Dkt. 33-4 at ¶¶ 11-12; Exhibit H to Supplemental Designation of Evidence, contemporaneously filed herewith, Ferree 2nd Decl. (hereafter "Exhibit H") at ¶ 10.)

Morrison's citation to the Employee Handbook overlooks essential language. (Dkt. 36-1 at 12.) Contrary to Morrison's contention, the Employee Handbook does not list "18 specifically forbidden actions," but rather it states that, "Specific examples of self-dealing activities by employees **include, but are not limited to**, the following:" and then lists examples. (Dkt. 33-5 at 15-16 (emphasis added.)) The policy continues, "If there is not a specific policy or procedure concerning a particular business action that may be considered self-dealing as set forth above, the employee should discuss the matter with his or her manager to determine the appropriate business conduct. Managers should consult with other internal parties as necessary." (*Id.* at 16.)

**IV.   Morrison's Assumption Regarding Milner's Disciplinary Authority Is Not Supported by a Citation and Is Inaccurate.**

Morrison claims that, "[w]hen disciplinary action was considered against a retail employee, such as an FCM, the employee['s] manager makes the final decision." (Dkt. 36-1 at 13 (citing 36-14 at 7.) However, nothing on the cited page (or the page before or after or page 17) supports this statement. In fact, Milner was not the decision maker with respect to Jacqueline Lonis ("Lonis") in the gaming incident—rather, a committee of six (6) individuals decided the discipline for all involved individuals, including Loins and Zahedi. (Exhibit H at ¶¶ 7-8.)

4

## V. Morrison's Discussion of a Fee Reversal Incorrectly Assumes a Fee Reversal Played a Role in Morrison's Termination.

Morrison spends roughly a page discussing a fee reversal. (Dkt. 36-1 at 14.) However, Swiergosz found the fee reversal performed by JillAnn Barnes was within Fifth Third guidelines—it was neither a policy violation nor a reason for Morrison's termination. (Dkt. 33-4 at 12 ("Investigations has no concern regarding the fee waived by Barnes as it was within the Bank's fee reversal guideline."))

## VI. Morrison's Discussion of Two Potential Comparators Confuses the Issues.

The facts Morrison cites regarding two potential comparators do not add up. Morrison was terminated for violating the self-dealing policy, but she cites to Lonis, who was found to have not violated policy, and to A.C., who was also terminated for violating the self-dealing policy. Regarding Lonis, Morrison admits Swiergosz concluded "no policy violation occurred." (Dkt. 36-1 at 16 (citing Dkt. 36-14 at 6.))[2] She speculates, however, that because Lonis was nonetheless given a coaching, she must have actually violated policy. (Dkt. 36-1 at 16.) Morrison provides no support for this speculation. Rather, the undisputed evidence is that Lonis was involved in a novel scheme to transfer performance points from FCMs to Retail Personal Banker Adonica Zahedi to inflate her performance numbers. (Exhibit H at ¶¶ 3-4.) Though the scheme was found to not violate policy and did not create a security risk, the involved individuals were nonetheless given a performance counseling. (*Id*. at ¶¶ 5, 7; Dkt. 36-14 at 6.)

For A.C., the facts Morrison cites in her Statement of Genuine Disputes all point toward A.C. not being similarly situated by emphasizing the differences between A.C.'s and Morrison's

---

[2] The actual quote is "this behavior did not actually violate any policies." (Dkt. 36-14 at 6.)

5

transgressions under the self-dealing policy. (Dkt. 36-1 at 17.) Confusingly, however, Morrison seems to argue in her Response Brief that Morrison and A.C. *are* similarly situated, and A.C. was treated better. (Dkt. 40-1 at 10 ("The disparity between the Defendant's tolerance for A.C., and its intolerance of Morrison is stark."))

Finally, Morrison points out that A.C. is the only other FCM under Milner who has been terminated for self-dealing. (Dkt. 36-1 at 18.) But she omits that five out of 21 FCMs under Milner had at least some disciplinary history, and A.C. is one of three FCMs terminated for cause under Milner. (Dkt. 36-12 at 2-5 (citation does not include Morrison.)) Indeed, A.C. was terminated for violating Fifth Third's self-dealing policy. (Dkt. 36-1 at 16-17; Exhibit H at ¶ 9.)

None of these issues are material to the issue at hand. Nonetheless, Fifth Third Replies to set the record straight.

Respectfully submitted,

*/s/ Dorothy D. McDermott*
Dorothy D. McDermott
Michael C. Mohler
Jackson Lewis P.C.
211 N. Pennsylvania Street, Suite 1700
Indianapolis, Indiana 46204
(317) 489-6930
(317) 489-6931 (facsimile)
dorothy.mcdermott@jacksonlewis.com
michael.mohler@jacksonlewis.com

Attorneys for Defendant Fifth Third Bank

6

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on March 23, 2021, a true and accurate copy of the foregoing *Defendant's Appendix: Reply to Plaintiff's Statement of Genuine Disputes* was filed electronically with the Court. Notice of this filing will be sent to the following by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Ilene Smith
Lori W. Jansen
Christopher C. Myers
CHRISTOPHER C. MYERS & ASSOCIATES
809 South Calhoun Street, Suite 400
Fort Wayne, IN 46802
ismith@myers-law.com
ljansen@myers-law.com
cmyers@myers-law.com

Jennifer L. Hitchcock
Law Office of Jennifer L. Hitchcock
116 E. Berry Street. Suite 625
Fort Wayne, IN 46802
jennifer@jhitchcocklaw.com

*/s/ Dorothy D. McDermott*
Dorothy D. McDermott