# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

F. RENEE MORRISON,                )
                                  )
     Plaintiff,                 )
                                  )   Case No. 1:18-CV-374
v.                                )
                                  )
FIFTH THIRD BANK,                 )
                                  )
     Defendant.                 )

## OPINION AND ORDER

This matter is before the Court on the motion for summary judgment and brief in support filed by Defendant Fifth Third Bank (ECF Nos. 32 and 33). Plaintiff F. Renee Morrison filed a response in opposition and supporting brief (ECF Nos. 36 and 40-1) and Fifth Third filed a reply (ECF No. 48). Morrison also filed a sur-response (ECF No. 52-1) and Fifth Third filed a sur-reply (ECF No. 57). Also pending is a motion to strike filed by Morrison (ECF No. 39), to which Fifth Third filed a response (ECF No. 45) but Morrison did not file a reply. Fifth Third also filed a motion to strike and brief in support (ECF No. 46 and 47), to which Morrison filed a response (ECF No. 54) and Fifth Third filed a reply (ECF No. 55). Briefing on all the motions was completed on April 29, 2021, and so they are ripe for resolution. For the reasons explained below, Plaintiff's Motion to Strike is DENIED; Defendant's Motion to Strike is GRANTED in part and DENIED in part; and Defendant's Motion for Summary Judgment is GRANTED.

## BACKGROUND

The Plaintiff was employed by the Defendant as a Financial Center Manager ("FCM"), commonly known as a branch manager, in Fifth Third's banking center in downtown Fort Wayne, Indiana, beginning on June 28, 2010, until her termination on March 8, 2017. Morrison

contends in her Complaint that "she was discriminated against and retaliated against by the Defendant on the basis of her race and color (black) in violation of her federally protected rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. . . . and 42 U.S.C. § 1981." Complaint (ECF No. 4), p. 1. Morrison alleges that "[i]n approximately 2015, Plaintiff, a branch manager level 1, applied for positions within the company at larger predominately white branches at Lima Road and Dupont Road. . . . Because the Lima and Dupont branches were bigger, if Plaintiff had been given one of the manager positions it would have been considered a promotion due to the higher salary and better benefits offered at the higher level. . . . Each time, Plaintiff was told that she 'didn't fit.' . . . When Plaintiff asked human resources for clarification as to why she 'didn't fit' and how her qualifications were lacking, she did not receive a substantive response." *Id*., p. 2. Morrison alleges that "[t]wo substantially younger Caucasian/white women with much less banking experience were hired for the Lima Road and Dupont Road positions." *Id*.[1] Morrison insists that she did not violate Fifth Third policy and that she "is aware of Caucasian/white employees who have allegedly violated policy in similar ways but were not terminated." *Id*. Morrison contends "that the proffered reason for her termination was false and pretextual[]" and that "[i]n reality, Plaintiff was discriminated against and retaliated against on the basis of her African American race and color[.]" *Id*. Morrison seeks to recover lost wages, compensatory and punitive damages. *Id*., p. 3. Prior to initiating this action, Morrison filed a Charge of Discrimination on June 28, 2017, alleging race discrimination and

---

[1] As discussed below in section II.B., notwithstanding Morrison's factual assertions regarding Fifth Third's alleged failure to promote her, she has no claim against the Bank for failure to promote, since any such claim or claims are time barred (a fact that Morrison concedes, as also discussed below). The allegations are included in this recitation of the background facts for completeness and because they are the subject of Fifth Third's motion to strike.

retaliation. *Id*., p. 6 (Exhibit A, Charge of Discrimination). The Fort Wayne Metropolitan Human Relations Commission issued a Dismissal of Complaint and Notice of Rights on August 16, 2018, (*id*., p. 8 (Exhibit B, Notice of Rights Letter)), and Morrison filed this lawsuit on October 17, 2018. Morrison initiated this lawsuit in state court and Fifth Third removed it to this Court pursuant to 28 U.S.C. §§ 1441 and 1446. Notice of Removal (ECF No. 1).

Morrison "was responsible for directing and administering the financial center, including managing sales, managing, training and coaching employees, and meeting operational goals." Defendant's Memorandum in Support of Motion for Summary Judgment (ECF No. 33), p. 4. Morrison reported to Regional Manager John Milner. *Id*. Fifth Third insists that it "terminated Morrison's employment on March 8, 2017, for violation of Fifth Third's policy against self-dealing." *Id*., p. 5. Fifth Third states that an internal investigation revealed that Morrison had violated bank policy by not following proper procedure in opening accounts for family members. *Id*., p. 4. Fifth Third argues that it is entitled to summary judgment because Morrison cannot establish a prima facie case of race discrimination or retaliation, and that she cannot establish that Fifth Third's proffered, nondiscriminatory explanation for her termination was pretextual.

## STANDARD OF REVIEW

Federal Rule 56 states that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The Supreme Court has explained that "the burden on the moving party may be discharged by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "'If the moving party has properly supported his motion, the burden shifts

3

to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial.'" *Simpson v. Gen. Dynamics Ordnance & Tactical Sys.-Simunition Operations, Inc*., 2019 WL 6912332, at *2 (N.D. Ind. Dec. 19, 2019) (quoting *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015)). Within this context, the Court must construe all facts and reasonable inferences from those facts in the light most favorable to the nonmoving party. *Id*. (citing *Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550 (7th Cir. 2017)). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp*., 24 F.3d 918, 920 (7th Cir. 1994). Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for resolving factual disputes.  *Id*. Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate.  *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). If it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated.  *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003).

"Summary judgment is a critical moment for a non-moving party. It must 'respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial.'" *Johnson v. Advocate Health & Hosps. Corp*., 892 F.3d 887, 893-94 (7th Cir. 2018) (quoting *Grant v. Trs. of Ind. Univ*., 870 F.3d 562,

568 (7th Cir. 2017)). "Inferences supported only by speculation or conjecture will not suffice." *Id*. (citing *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 721-22 (7th Cir. 2018)). "Neither will the mere scintilla of evidence." *Id*. (citing *Grant*, 870 F.3d at 571).

The Seventh Circuit in recent years has refined the summary judgment standard of review in employment discrimination cases, explaining as follows:

> On top of the normal lattice of summary judgment demands, we must also apply the constructs of employment discrimination law. For years we have tangled with a "rat's nest of surplus tests" in employment discrimination cases–struggling to pigeon hole evidence into the direct or indirect method with various overlaying requirements of "convincing mosaics" and circumstantial or direct evidence. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764-66 (7th Cir. 2016). Our Circuit has now clarified the singular question that matters in a discrimination case:

> "[W]hether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765. "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself. . . . Relevant evidence must be considered and irrelevant evidence disregarded." *Id*.

*Johnson*, 892 F.3d at 893-94.

## DISCUSSION

Before addressing the motion for summary judgment the Court must resolve the parties' motions to strike certain evidence. To the extent the motions are granted, the Court will not consider the challenged evidence when determining the issues presented on summary judgment.

### I. Plaintiff's motion to strike (ECF No. 39).

Morrison argues in her motion to strike that "[a]fter reviewing Defendant's [evidentiary] submissions, Plaintiff respectfully moves to strike portions of several, because they contain inadmissible evidence[.]" Plaintiff's Motion to Strike (ECF No. 39), p. 1. Specifically, Morrison

5

takes issue with certain statements contained in affidavits by Sara Swiergosz, Angela Spry, and Jenean Ferree.[2] Morrison argues that all three affidavits contain inadmissible hearsay evidence.

### A. Swiergosz declaration.

Morrison argues that Swiergosz's affidavit "contains a number of paragraphs in which she repeated statements that she alleges were made to her, prior to the Plaintiff's termination." Plaintiff's Motion to Strike, p. 1. Morrison asks the Court to strike paragraphs 14, 15 and 16 of the affidavit because they are "inherently unreliable hearsay." *Id*. In those paragraphs, Swiergosz recounted as follows:

> 14. Barnes also told me that, on January 13, 2017, Barnes typed up signature cards without an account number that contained Cheneta (née Morrison) Robinson's married last name at Morrison's request without obtaining the marriage license for validation. Barnes stated she didn't obtain the marriage license because Morrison spoke of her daughter's wedding.

> 15. Barnes also told me, and Exhibit H confirms, that on January 13, 2017, Morrison asked Barnes to type up two signature cards where the account number was left blank so that two new joint accounts could be opened at a later date for Morrison's adult children.

> 16. Barnes stated that she had worked with Cheneta over the years and had met her in person and completed requests for her via the telephone. Barnes further stated that Morrison asked her to prepare (type up) the signature cards for Morrison to take home to have Morrison's adult children [sign] while they were in town. Barnes stated that she felt that, if she did not comply with this request by Morrison, Morrison may retaliate against her.

---

[2] Swiergosz "was Corporate Investigator for Fifth Third Bank . . . [and] was assigned to investigate irregularities with signature cards at the Fort Wayne Downtown financial center." Declaration of Sara Swiergosz (ECF No. 33-4), p. 1. Angela Spry "was the Regional Risk Administrative Manager ('RRAM') over Fifth Third's Fort Wayne Downtown financial center in 2017, including in January and February 2017." Declaration of Angela Spry (ECF No. 33-5), p. 1. Jenean Ferree "[has] been an Employee Relations Consultant and Assistant Vice President for Fifth Third Bank[.]" Declaration of Jenean Ferree (ECF No. 33-6), p. 1. All three participated in the investigation into Morrison's alleged "self-dealing" and it was Ferree who "recommended to John Milner that Morrison's employment be terminated[.]" Ferree Decl., p. 4.

Swiergosz Decl. (ECF No. 33-4), p. 4. Morrison argues that these statements are inadmissible hearsay since "'[t]estimony recounting what another individual said is a classic example of hearsay.'" Plaintiff's Motion to Strike, p. 2 (quoting *Gralia v. Edwards Rigdon Constr. Co., Inc.*, No. 1:19-CV-02079, 2020 WL 5913280, at *3 (S.D. Ind. Oct. 6, 2020)).

Morrison also asks the Court to strike paragraphs 18, 22 and 24 of Swiergosz's affidavit, which read as follows:

> 18. Smith told me that Morrison requested he opened this account for Morrison's family member who was having a family emergency. He also said that he did not feel comfortable doing what Morrison asked of him, but he did it because Morrison is the FCM. Smith told me that Morrison's adult children were not present at the time of account opening, that he did not speak with either of them on the phone, and that he does not know these individuals.
>
> . . .
>
> 22. From reviewing the records, I know that January 19, 2017, at approximately 12:31 EST, Smith opened joint savings account for Morrison's adult children even though neither was present, he did not speak with either of them on the phone, and he did not know these individuals. Smith told me Morrison requested he open the account for her family member who Morrison said was having a family emergency. Smith did not feel comfortable doing so, but he did it because Morrison was the FCM.
> . . .
>
> 24. Smith told me Morrison presented him copies of Drivers Licenses for her adult children, however he could not recall if Cheneta's maiden name or married name was on the license.

Swiergosz Decl., pp. 3-4. Morrison argues that these statements are also inadmissible hearsay and "[a]ll three paragraphs are simply repetition by Swiergosz of a series of non-party out of court statements, that were not made under oath, but are being offered by the Defendants to prove the truth of the matter they are asserting." Plaintiff's Motion to Strike, p. 2.

Fifth Third maintains that Morrison is wrong when she argues that the evidence is

inadmissible. Fifth Third contends that "for a statement to be hearsay, it must be offered 'for the truth of the matter asserted.'" Defendant's Response in Opposition to Plaintiff's Motion to Strike (ECF No. 45), p. 1 (quoting Fed.R.Evid. 801(c)). Fifth Third explains that it "includes the statements, not as proof that they are accurate, but to show what the declarants believed Morrison did to violate policy, thereby foreclosing Morrison's argument that she met Fifth Third's expectations, as well as her pretext [argument]." *Id*. Fifth Third argues that the statements made to Swiergosz by other employees during the course of Swiergosz's investigation are not being offered to prove that Morrison violated bank policy, but "to show what Swiergosz, Spry, and Ferree *believed* to be true. Whether their beliefs were accurate is irrelevant to Fifth Third's argument." *Id*., p. 2 (italics in original). Fifth Third contends that "irrespective whether the third-party's unsworn statements are accurate, they are relevant to show the listener's state of mind." *Id*. (citing *Stewart v. Henderson*, 207 F.3d 374, 377 (7th Cir. 2000)). As stated at the outset, Morrison chose not to file a reply brief on this issue.

Fifth Third is correct. The challenged statements are admissible because they are not presented to prove that Morrison violated policy, but to show what Fifth Third's decision makers believed when they made the decision to fire her. The truth of those allegations is irrelevant, but the allegations themselves are relevant to the issue of pretext and are admissible for that purpose. "If [the employer] honestly explain[s] the reasons behind [its] decision, but the decision was ill-informed or ill-considered, [the] explanation is not a "pretext." *Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 559 (7th Cir. 1987). Morrison insists that she was performing her job well and meeting Fifth Third's reasonable expectations, and that the Bank's proffered nondiscriminatory explanation for its decision to fire her was pretextual. Fifth Third submits the affidavits of

Swiergosz, Spry and Ferree to show otherwise–that Fifth Third terminated Morrison's employment because it legitimately *believed* she had violated bank policy. Whether she did or not is irrelevant; therefore, the statements are admissible and Morrison's motion to strike portions of Swiergosz's affidavit is denied.

### B. Spry and Ferree Declarations.

Morrison asks the Court to strike several paragraphs of Spry's and Ferree's declarations for the same reason–arguing that they contain the same type of hearsay. And for the same reason, the motion is denied. Spry's and Ferree's declarations, like Swiergosz's, include statements made to them by other bank employees during the investigation into Morrison's alleged conduct. But since the statements are offered to show what Fifth Third decision makers believed when they terminated Morrison, rather than to prove the truth of the underlying accusations, they are admissible and will be considered by the Court.

### II. Defendant's motion to strike (ECF No. 46).

Fifth Third also filed a motion to strike, challenging several items of evidence that Morrison submitted on the basis that "much of the evidence Morrison cites is inadmissible because it lacks foundation or is hearsay." Defendant's Brief in Support of Motion to Strike (ECF No. 47), p. 1. The challenged evidence includes certain statements made in three affidavits (Morrison's, one by Jaqueline Lonis and one by Trisha Murphy), a "letter dated June 1, 2013, and addressed to Human Resources Representative Jennifer Polakoff-Hewett[,]" and a Determination issued by the Fort Wayne Metropolitan Human Relations Commission. *Id*., pp. 4-9. Fifth Third also challenges portions of Plaintiff's Statement of Genuine Issues, arguing that "it strays too far from merely stating disputed facts and instead rehashes and emphasizes undisputed

facts." *Id.*, p. 1. Finally, Fifth Third moves "the Court to disregard Morrison's evidence regarding

any alleged failure to promote, so as to avoid a trial-within-a-trial on claims that are time barred."

*Id.*

### A. Plaintiff's Statement of Genuine Issues.

Fifth Third objects to Morrison's Statement of Genuine Issues, stating as follows:

> As an initial matter, Morrison's filing titled "Statement of Genuine Disputes"
> does not comply with Local Rule 56-1(b)(2) because it is not limited to disputed
> facts. Rather, it is Morrison's lengthy retelling of the facts, including many things
> on which the parties agree, but with a smattering of disagreements scattered
> throughout. What is more, Morrison re-files exhibits that are already in the record,
> and not always accurately. Docket entry 36-7 is a three-page portion of the
> 19-page signature card policy, and Morrison cites this portion in arguing that the
> signature card policy is incomplete in that it lacks all purported exceptions. (Dkt.
> 36-1 at 7.)
>
> By reiterating and emphasizing points of agreement, the filing puts irrelevant facts
> front-of-mind and serves to confuse the issues. This tactic should not be
> permitted. Such violations of Local Rule 56-1(b)(2) "place an undue burden and
> prejudice not only on the defendant but also the Court."

Defendant's Brief in Support of Motion to Strike (ECF No. 47), pp. 1-2 (quoting *Cooper v.

Eaton Corp.*, 498 F.Supp.3d 1053, 1069 (N.D. Ind. 2020).

Morrison responds by arguing that her factual recitation, which she concedes includes

disputed facts as well as "[o]ther relevant, but undisputed facts," is proper and "complie[s] with

L.R. 56-1(b)." Plaintiff's Response in Opposition to Defendant's Motion to Strike (ECF No. 54),

pp. 3-4. Morrison insists that "[t]he Defendant's objections to inclusion of these additional facts

are essentially an objection to relevant and material facts that the Defendant wishes to ignore[.]"

*Id.*, p. 3.

Fifth Third's challenge to Morrison's Statement of Genuine Disputes is a general

10

objection to what Fifth Third characterizes as Morrison's attempt to confuse or "spin" the facts in an effort to get the Court to take its eye off the ball. The Court agrees that Morrison plays a bit fast and loose with her recitation of facts (both disputed and undisputed) in her Statement of Genuine Disputes. Her Statement of Genuine Issues is more akin to another brief rather than a focused presentation of genuine issues. That said, the Court is confident that it can resolve the issues presented without being distracted by Morrison's arguably improper recitation in her Statement of Genuine Issues. Therefore, Fifth Third's motion to strike is denied.

### B. Allegations regarding failure to promote.

Fifth Third argues that "Morrison's allegations that Milner failed to promote her confuse the issues and are prejudicial to Fifth Third. Morrison's factual contentions [regarding] Milner's alleged 2013 use of the word 'fit' cross the line from background into being a prejudicial end-run of the statute of limitations that confuses the issues and necessitates a burdensome trial within a trial." Defendant's Brief in Support of Motion to Strike, p. 2. Fifth Third argues that any evidence or argument that Fifth Third failed to promote Morrison should be excluded under Federal Rule of Evidence 403, which provides that "the Court 'may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.'" *Id*. (quoting Fed. R. Evid. 403). Fifth Third also notes that "Morrison concedes that the statute of limitations cuts off any failure to promote claims she may have had that were based on events before October 17, 2014." *Id*. Indeed, Morrison writes that "[a]lthough Morrison may not be able to proceed with claims arising from the failure to promote her before October 17, 2014, that does not remove the admissibility of

evidence relating to Milner's failure to hire or promote Morrison . . . before that date." Plaintiff's Memorandum in Opposition to Motion for Summary Judgment (ECF No. 40-1), p. 19.  Morrison argues that evidence that Milner failed to hire her into another FCM position several years before the events giving rise to her present claims "is evidence reflecting a pattern of racially discriminatory bias and/or Milner's later discriminatory or retaliatory state of mind when he terminated Morrison." *Id*. So, while Morrison concedes that any failure to promote claims are time barred, she maintains that evidence of those decisions is admissible anyway because it illuminates Milner's "state of mind when he terminated Morrison" several years later.

Fifth Third argues that even though Morrison concedes that she cannot pursue any failure to promote claims, "in [her] introduction [to her response brief  in opposition to summary judgment], the first factual allegation she lists is her contention that Fifth Third discriminated against her 'by failing to promote her into [a] position she was qualified to fill.'" Defendant's Brief in Support of Motion to Strike, p. 3 (quoting Plaintiff's Response in Opposition to Motion for Summary Judgment, p. 2). Fifth Third also notes that "Morrison spends significant portions of her Response Brief and her Statement of Genuine Disputes arguing that, because of her race, John Milner failed to promote her. . . . Morrison's leading argument that she has evidence of racial bias in Fifth Third's decision making is her contention that she was the 'superlative choice' and Fifth Third failed to promote her." *Id*. (citations to Plaintiff's Response omitted).

The Court agrees with Fifth Third that Morrison cannot attempt to inject a time-barred failure to promote claim into this litigation through a back door by insisting that the evidence adds "context" to her claim that she was discriminated against when she was fired several years later. Accordingly, Morrison cannot present evidence or argument to show that she was denied a

promotion, and to that extent Fifth Third's motion is granted.

But just because Morrison cannot pursue a failure-to-promote claim or seek damages for such a claim does not mean that she cannot present this evidence at all. While Morrison concedes that she cannot pursue a failure-to-promote claim, she insists that evidence of Milner's refusal to consider her for a promotion or transfer is still admissible because it relates to, and adds context to, her argument that Milner held discriminatory animus toward her when he fired her in 2017 (after she brought up Milner's "fit" comment again during her performance review).

Morrison insists that the evidence of Fifth Third's failure to promote her in 2013 "is relevant to the claims she is proceeding forward with–that she was terminated either due to her race, and/or in retaliation for objecting to what Morrison reasonably believed was a history of racially discriminatory treatment by Milner. The evidence of what happened to Morrison in 2013, and statements she and the Defendant's other employees or managers made at the time, demonstrates genuine issues of material fact from which arise reasonable inferences arise [sic] that Milner held a longstanding, racial bias against Morrison in 2017. The same evidence also adds further context to explain why in February 2017 when Morrison confronted Milner about his prior comments regarding her alleged lack of 'fit,' would engender retaliatory motives that prompted him to terminate her within a few short weeks." Plaintiff's Response in Opposition to Defendant's Motion to Strike, pp. 4-5. In short, Morrison argues that she can present evidence of Fifth Third's alleged failure to promote her in 2013 in order to provide "context" for Fifth Third's 2017 decision to fire her. Fifth Third insists that "[t]he confusion caused by dragging eight-year-old allegations into this dispute substantially outweighs any marginal relevance of the stray remark." Defendant's Reply in Support of Motion to Strike (ECF No. 55), p. 2.

Morrison does not cite or discuss authority in support of her argument, but there is plenty

of it. Another district court addressing this issue held as follows:

> . . . Defendant argues that all claims based on events that occurred more than four
> years before Plaintiff filed his complaint (*i.e.*, August 25, 2013) are time-barred.
> Plaintiff does not dispute that claims based on events that occurred before August
> 25, 2013 are time-barred. Plaintiff notes, however, that "[i]t is well settled that
> evidence of earlier discriminatory conduct by an employer that is time-barred is
> nevertheless entirely appropriate evidence to help prove a timely claim based on
> subsequent discriminatory conduct by the employer." *Mathewson v. Nat'l
> Automatic Tool Co.*, 807 F.2d 87, 91 (7th Cir. 1986). Thus, to the extent that
> Plaintiff seeks to bring claims based on conduct occurring before August 25,
> 2013, Plaintiff's claims are time-barred. *However, the Court still will consider
> conduct occurring before that date, to the extent that such conduct is evidence of
> a later discriminatory intent.*

*Moore v. CN Transportation Ltd.*, No. 17-CV-6188, 2021 WL 111489, at *10 (N.D. Ill. Jan. 12,

2021) (italics added). *See also*, *Edwards v. Indiana Univ.*, 823 F.App'x 441, 443 (7th Cir. 2020),

*cert. denied*, 141 S.Ct. 1388 (2021) ("Such time-barred evidence may not form the basis of a

Title VII discrimination claim, though it can be relevant for a court's evaluation of a claim that is

timely filed.") (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S.Ct. 2061,

153 L.Ed.2d 106 (2002) and *Malin v. Hospira, Inc.*, 762 F.3d 552, 561 (7th Cir. 2014));

*Abudayyeh v. Envoy Air, Inc.*, No. 19-CV-5802, 2020 WL 5819868, at *6 (N.D. Ill. Sept. 30,

2020) ("[T]o the extent [Plaintiff's] ADA claim concerns discrete acts that occurred prior to

April 26, 2017–including her termination on February 13, 2017–the Court dismisses the claim as

time-barred. *But [Plaintiff] may still use the time-barred instances of alleged discrimination as

background evidence in support of the timely-filed portions of her ADA claim*.") (citing *Morgan*,

536 U.S. at 113) (italics added); *Ross v. UChicago Argonne, LLC*, No. 18-CV-4200, 2020 WL

2041338, at *8 (N.D. Ill. Apr. 28, 2020) ("Even where a discrete act may be 'time-barred' on its

own, it may still be used as 'background evidence in support of a timely claim.'") (quoting *Morgan*, 536 U.S. at 113).

Based on the foregoing authority, the Court denies Fifth Third's motion to strike to the extent it seeks to exclude the introduction of the challenged evidence for *any* purpose. Morrison cannot introduce this evidence to argue a failure-to-promote claim, but she can introduce it as "background evidence in support of a timely claim," i.e., her wrongful termination and retaliation claims, and the Court will consider it in that limited context.

### C. Statements in Morrison, Lonis and Murphy affidavits.

#### 1. Plaintiff's Affidavit (ECF No. 36-8).

Fifth Third moves to strike certain paragraphs from the affidavits of the Plaintiff and two former employees, Jacqueline Lonis and Trisha Murphy. Fifth Third moves to strike paragraphs 5, 7 and 12 of Morrison's affidavit (ECF No. 36-8).

In paragraph five, Morrison states: "Based on my training, education, and experience in the banking industry and as an experienced FCM with the Defendant, I was passed over by John Milner instead of being hired or promoted into the positions." Morrison Aff., ¶ 5. Fifth Third contends that "Morrison's affidavit does not lay any foundation for her claim that she 'was passed over.' In her deposition, Morrison admitted that she did not know the qualifications of the women who were put in the roles at issue. . . . Thus, she has no basis to state she was 'passed over.'" Defendant's Brief in Support of Motion to Strike, pp. 4-5.

Morrison responds by contending that Fifth Third is "quibbling over terminology, and based on Morrison's observations that she described in her affidavit, her use of the terminology to describe failing to be hired into positions that she desired, when FCM's [sic] that were outside

of her race were chosen instead, for whatever reason or alleged reason the Defendant had, can still be legitimately termed being 'passed over.'" Plaintiff's Response in Opposition to Motion to Strike, p. 6.

The Court has already concluded that Morrison cannot present evidence or argument that Fifth Third failed to promote or transfer her to another branch since this evidence and argument is time-barred and unduly prejudicial. That said, Morrison can, for purposes of background and context, rely on the evidence that she applied for but was not selected for another FCM position and that Milner told her it was because she was not a good "fit" for another position. The Court agrees that this boils down to quibbling over terminology. While Morrison's use of the term "passed over" arguably implies a failure to promote, the Court is not misled by the term, and will consider Morrison's factual assertions on summary judgment to the extent that they elucidate Morrison's *timely* argument that Fifth Third harbored racial animus when it terminated her several years later. Fifth Third's motion to strike is denied on this point.

In paragraph seven of her affidavit, Morrison states that during the course of her employment she "was familiar with the Lima Road and Dupont Road back branches from my past visits to them[]" and that she "was still visiting the Dupont branch about 2-3 times per month. During my visits to the Lima road branch, I observed that the racial makeup of the customers was around 30% black, and 70% white and non-black. At the Dupont Road branch, the customer make up was about 15% black, to 85% white and non-black customers. At my Downtown branch where I, the African American FCM was assigned to work, the racial makeup of our clientele was much different, with 60% black, while only about 40% of the customer were white and nonAfrican American." Morrison Aff. (ECF No. 36-8), p. 4.

16

Fifth Third contends that this paragraph should be stricken "because Morrison does not establish she has sufficient firsthand knowledge to support her claim to know the demographic makeup of the Lima Road branch's customer base in 2012 and 2013. Morrison claims she visited the branch 2-3 times per month nine years ago. Morrison does not claim she tracked the race of the customers who came into the branch or provide any reason to think Morrison could provide precise percentages of the racial makeup of the Lima Road customer base." Defendant's Brief in Support, p 5.

Morrison responds by arguing that "[p]aragraph 7 . . . is admissible, because it sets forth sufficient foundation and grounds to support her representation of the demographic makeup of the Lima Road branches' customer base in 2012 and 2013–she visited the branch numerous times, and made observations for herself." Plaintiff's Response in Opposition, p. 7.

In its reply brief, Fifth Third insists that "Morrison's claims in paragraph 7, regarding the purported demographic make-up of the customer base of the Lima Road branch, are not admissible evidence. Morrison offers what would appear to be precise data: 30% black and 70% white and non-black. Visiting a business 23 times over two years–without taking any affirmative steps to accurately measure or track demographics–does not give Morrison personal knowledge to make such assertions. Morrison has no more basis to testify to the precise demographics of Lima Road's 2013 customers than she does to testify to the precise demographics of the 2013 customer base of a local coffee shop she may have patronized every few weeks, but to which she has not been back since 2013." Defendant's Reply in Support (ECF No. 55), p. 3. Fifth Third also argues that "Morrison's speculation regarding the reason Fifth Third does not offer admissible evidence to contradict Morrison's supposed data is not persuasive. It is Morrison, not

17

Fifth Third, that possesses the burden of proof." *Id.*, n. 1.

Fifth Third insists that Morrison cannot present this evidence of the racial makeup of the other branches because she did not take "any affirmative steps to accurately measure or track demographics" and therefore this evidence is not based on hard data, but only on her own observations.

Neither Fifth Third nor Morrison cite or discuss any authority for their respective positions, but once again there is some–and it supports Morrison's argument. In *Ultimax Transp., Inc. v. Brit. Airways, Inc.*, the defendant filed a motion to strike several affidavits submitted by the plaintiff, raising the same arguments Fifth Third raises here. The district court explained and held as follows:

> Defendant has filed a Motion to Strike . . . Affidavits . . . , which affidavits plaintiff filed in connection with its brief in response to defendant's Motion for Summary Judgment. Defendant argues that these affidavits should be struck from the record because the affiants have not shown affirmatively that they have personal knowledge of all the information contained in the affidavits, and because the affidavits are "filled with conjecture, speculation and unsupported 'facts.'" . . . Plaintiff argues that defendant's objections to the affidavits relate to the credibility of the affiants or the weight that should be given to the affidavits, and, therefore, those matters are for consideration by the jury and the affidavits should not be stricken from the record.

> The Court agrees with the plaintiff, in part, that much of defendant's objections relate to the credibility of the affiants and the weight that the affidavits should be accorded. For example, [one witness] states in his affidavit that, "[o]f the four ABE employees who work the same shifts as I did, three were Caucasian." . . . Defendant moves that this statement be struck, because it "is not evidence of the racial makeup of ABE. It is simply a non-reliable, anecdotal statement regarding affiant's limited knowledge of ABE employees." . . . Thus, defendant's objection is that the affiant's testimony should not be given much weight because it is "non-reliable" and "anecdotal" and because the affiant has "limited knowledge." Defendant's objection relates solely to the credibility of the affiant and the weight that the testimony should be given, and does not provide a basis for striking the affidavit from the record.

18

Defendant also objects to many other statements in the affidavits that are based on the affiants' personal observation and experience, on the grounds that such statements are "unsupported" or are "unreliable" as evidence. Many of the affiants' statements are clearly based solely on their personal observations, and thus may be considered "anecdotal" and perhaps "limited" in their application to the ultimate issues in this action, *but that does not render the evidence inadmissible*.

*Ultimax Transp., Inc. v. Brit. Airways, Inc.*, 231 F.Supp.2d 1329, 1334-35 (N.D. Ga. 2002) (italics added). *See also*, *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (noting that affidavits based on personal knowledge may include reasonable inferences, so long as those inferences are based on observation or first-hand experience). In this instance, Morrison's statement reflects her personal observations and the Court will consider it to the extent that it adds context and background to Morrison's argument that a reasonable inference can be drawn that Milner's "fit" comment referred to her race. The Court will consider this evidence for that limited purpose, although in the end it does not alter the Court's analysis or conclusions.

In paragraph 12 of her affidavit, Morrison states that she "never violated the Defendant's policies or procedures addressing self-dealing, conflicts of interest, gaming, attendance, signature cards," [sic]. Fifth Third argues that "Morrison cannot rely on this self-interested, unsupported, and conclusory statement. . . . This bare statement cannot create a factual dispute and should be struck." Defendant's Brief in Support of Motion to Strike (ECF No. 47), p. 5.

In response, Morrison argues this statement is admissible because "'a self-serving affidavit is an acceptable method for a non-moving party to present evidence of disputed material facts[.]'" Plaintiff's Response in Opposition, p. 7 (citation omitted). In reply, Fifth Third insists that "[s]imply put, Morrison's opinion is irrelevant–the issue is only whether Fifth Third honestly believed she violated its policies. . . . So, rather than offer her irrelevant opinion, paragraph 12

appears to be offered as a conclusion Morrison wants the Court to adopt. The Court should, therefore, disregard and strike paragraph 12." Defendant's Reply (ECF No. 55), p. 4.

This is another unnecessary skirmish. Fifth Third is correct that whether Morrison violated bank policy is irrelevant–the issue is whether Fifth Third *believed* she did. Morrison must present admissible evidence to support her argument that Fifth Third's reason for her termination was pretextual, i.e., a lie. The Court agrees with Fifth Third that Morrison's conclusory statement does not, by itself, create a fact issue as to pretext and Fifth Third need not fear that the Court will "adopt" Morrison's blanket "conclusion." Morrison's statement is nothing more than a conclusory assertion that Fifth Third's proffered reason for her termination was pretextual. The issue of pretext, which is dispositive of this case, will be addressed below when the Court can finally get to the meat of the motion for summary judgment. Morrison's conclusory statement that she did not violate bank policy is immaterial to the dispositive issue of pretext, since the issue is not whether Morrison violated bank policy, but whether Fifth Third can establish that it honestly *believed* she did. Morrison's burden on summary judgment is to show that Fifth Third's proffered, nondiscriminatory explanation for her termination was a lie. She cannot do that simply by claiming that her actions did not violate bank policy. The Court will address this at greater length below when discussing the issue of pretext. Given that Morrison's conclusory assertion does nothing to change the outcome, there is no reason to strike it and Fifth Third's motion is denied.

### 2. Lonis Affidavit (ECF No. 36-9).

Fifth Third moves to strike two paragraphs from the affidavit of Jaqueline Lonis, a former FCM at Fifth Third. Fifth Third explains that in paragraph 8 "Lonis offers that, as a former

[FCM], she is familiar with Fifth Third's disciplinary patterns. Lonis then posits that 'at least 80% of the time the defendant followed a progressive discipline procedure.'" Defendant's Brief in Support, p. 5 (quoting Lonis Aff. (ECF No. 36-9)). Fifth Third argues that "Lonis offers no basis for this purported personal knowledge. Moreover, Lonis does not provide any reason to believe she would be familiar with the disciplinary patterns of any other location, whether under Milner or anyone else. It is pure speculation without any foundation." *Id*., p. 6. Lonis also states in her affidavit "that when she 'worked for the Fifth Third Bank, gaming was considered to be as serious of a policy violation as self-dealing.' However, Lonis does not cite any training on this topic, special authority to weigh violations, or even that she had the authority to discipline employees for either violation. Lonis's affidavit does not provide any firsthand experience with the self-dealing policy, and her only claimed experience with the gaming policy is when Swiergosz found she did not violate it. Thus, the Court cannot accept her testimony as evidence." *Id*. (quoting Lonis Aff.).

Morrison responds by contending that "like Ms. Morrison, Ms. Lonis was a former long-term employee of the Defendant's . . . and was [an FCM] from 2015 through 2017. . . . Lonis[,] like Morrison, was therefore in a position to have observed and be familiar with the Defendant's typical disciplinary practices, making this statement admissible." Plaintiff's Response in Opposition, p. 8. Morrison also argues that "based on Lonis' experience as an FCM for two years, as well as her non-FCM experience with the Defendant for many years prior to that, Lonis was in a position to personally observe what the Defendant's training, policies, and conduct was when addressing the subject of gaming and self dealing." *Id*., p. 9.

In its reply brief, Fifth Third maintains as follows: ". . . Morrison postulates that, since

Lonis was an FCM for two years and a Fifth Third employee for even longer, she must have observed Fifth Third's responses to gaming and self-dealing violations. This speculation is not supported by Lonis's affidavit or the record, and it is not sufficient to establish personal knowledge. Lonis does not claim that Fifth Third trained her that Fifth Third considered self-dealing and gaming to be equally serious violations. Morever, there is no indication Lonis ever witnessed or was part of any occurrence in which she could witness Fifth Third treating a gaming violation as seriously as a self-dealing violation." Defendant's Reply in Support, p. 4.

Morrison presents this evidence to undermine Fifth Third's argument that she violated bank policy, i.e., that Fifth Third's proffered reason for firing her was phony. As the Court will explain below, the issue of pretext is the dispositive issue in this case, and the Court's conclusion–that Morrison fails to refute Fifth Third's proffered reason for her firing–would be the same regardless of Lonis's statement in paragraph 8 of her affidavit. Accordingly, Fifth Third's motion to strike this statement is denied.

Fifth Third also moves to strike paragraph 17 of Lonis's affidavit, in which she states: "Because of my work with Renee Morrison at Fifth Third Bank, as well as my contact with her since, my personal experience and observations of her is that she is one of the most honest, by-the-book people I have ever worked with, and that she is a very truthful and honest person." Fifth Third argues that this "is inadmissible character evidence. 'Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.' Fed.R.Evid. 404(a)(1). Lonis offers that Morrison is honest and trustworthy in an apparent effort to show that Morrison acted in accordance with those alleged traits and did not violated Fifth Third policies. Thus, the paragraph should be

struck." Defendant's Brief in Support, p. 6.

Morrison responds by contending that "Federal Rule of Evidence 608(a) allows a witness's credibility to 'be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations; 1) the evidence may refer only to the character for truthfulness or untruthfulness, and 2) evidence of truthful character is admissible only after the character of the witness for truthfulness had been attacked by opinion or reputation evidence *or otherwise*.'" Plaintiff's Response in Opposition, p. 9 (quoting Fed.R.Evid. 608) (italics in original). Morrison contends that "[t]he Defendant's allegation that Morrison engaged in self-dealing, by instructing her subordinates to assist her with the adult children's accounts and allegedly to her own and her family members' benefit, is an allegation by the Defendant that attacks Morrison's character for truthfulness and honesty–which goes to her credibility on any testimony she provides in this case. . . . 'Under Rule 405(a), if a person's character or character trait is admissible, the parties may present evidence of that character or trait through reputation or opinion testimony.'" *Id*. (quoting Fed.R.Evid. 405).

In its reply brief, Fifth Third argues that "[r]egarding paragraph 17, Morrison concedes that the paragraph is not admissible to suggest Morrison did not violate policy. . . . Morrison contends the character evidence is solely offered to rehabilitate Morrison's general credibility which is not helpful at this stage, when the issue is whether Fifth Third honestly believed she Morrison [sic] violated its policies." Defendant's Reply, p. 5.

Again, the issue before the Court on summary judgment is whether Fifth Third's proffered reason for firing Morrison is worth of credence. Morrison's reputation for honesty is of no moment to the Court. Since the Court need not determine whether Morrison violated any

policy, her honest and trustworthy character is not at issue and is not relevant to the Court's analysis. As Fifth Third put it, the statement is simply "not helpful at this stage." For this reason, the Court grants Fifth Third's motion and will not consider this evidence of Morrison's character or propensity for honesty when deciding the motion for summary judgment.

### 3. Murphy Affidavit (ECF No 36-11).

Trisha Murphy, also a former FCM, states in her affidavit that she is "familiar with [Morrison] and her work[]" and concludes by stating "[b]ased on my observations of Renee Morrison's work and my interactions with her when I worked at Fifth Third Bank, and after leaving the company, I got to know her well. Based on my observations and experience with her, I consider [Morrison] to be an honest and trustworthy person of strong and honest character." Murphy Aff. (ECF No. 36-11), p. 2, ¶ 6.

The parties repeat the arguments they made regarding the similar statement made by Lonis. Defendant's Brief in Support, p. 6 ("paragraph 6 of Murphy's affidavit it inadmissible character evidence under Rule 404(a)(1). Morrison cannot rely on Murphy's opinion of Morrison's character to show Morrison did not violate Fifth Third policy."); Plaintiff's Response in Opposition, p 10 ("[f]or the same reasons that Defendant's objection to paragraph 17 of the Jaqueline Lonis affidavit should be denied, so should the Defendant's objection to paragraph 6 of the Trisha Murphy Affidavit be denied as well."); Defendant's Reply in Support, p. 5 ("Morrison relies on the same argument in support of paragraph 6 of Murphy's affidavit as she does with paragraph 17 of Lonis's affidavit–to rehabilitate Morrison's general credibility as a witness. Fifth Third maintains its objection to the extent the paragraph is offered to suggest Morrison did not violate Fifth Third policy.").

Likewise, the Court stands by its reasoning and conclusion stated above regarding Lonis'

statement, grants Fifth Third's motion, and will not consider this character evidence offered by

Murphy.

### D. June 1, 2013, Letter.

This challenge involves a letter Morrison wrote, dated June 1, 2013, and which she

claims she sent to Fifth Third's Human Resources Representative, Jennifer Polakoff-Hewett

(ECF No. 36-13). In that letter, Morrison complains about not being selected to fill the FCM

position at the Dupont Road location and also states that she does "not understand what the word

'fit' means when it comes to the qualifications of the position I am currently performing."

Plaintiff's Exh. 13. She expresses concern that she did not get the position even though she felt

she was qualified for it. *Id*.

Fifth Third argues that "[t]he Court should strike the letter . . .and disregard all arguments

based on it because Morrison does not establish the proper foundation to enter the letter into

evidence. Specifically, the only foundation [] Morrison lays for the letter is her testimony that she

'submitted' a copy to Polakoff-Hewett. . . . However, Morrison relies on the letter as evidence of

Polakoff-Hewett's knowledge, despite the fact Morrison does not offer any foundation for her

assumption that the letter was received and read. For Morrison to rely on this letter to show

Polakoff-Hewett's knowledge, she would need testimony from Polakoff-Hewett confirming she

received and reviewed the letter. Because it lacks the necessary foundation for the purpose

Morrison offers it, the Court should strike the June 1 letter and disregard Morrison's arguments

based on it." Defendant's Brief in Support, p. 7.

Morrison insists that the letter does not lack foundation "because Morrison testified in her

Affidavit [Plaintiff's Exhibit 8 (ECF No. 36-8)] that Exhibit 13 is a true and accurate copy of [the] letter[.]" Plaintiff's Response in Opposition, p. 10. She also insists that it is relevant because it shows she "discuss[ed] her concern about Milner's 2013 comment that he thought Morrison 'didn't fit,' and her that because [sic] failed to provide her 'one measureable reason to explain his perception, that Morrison's race was the cause of Milner's perception and the reason she was not given a position at the Defendant's Lima Road or Dupont road bank branches." *Id*. Morrison insists that "[t]he evidence is also relevant, because the . . . letter provides information as to the basis of Morrison's February 2017 discussion with Milner that she alleges lead up to the final termination decision . . . and adds context to the basis of the allegations that Milner had unlawful retaliatory motives for terminating Morrison." *Id*.

In its reply brief, Fifth Third reiterates that "Morrison does not lay any foundation to suggest Fifth Third *received* the June 1, 2013, letter. Morrison specifically relies on the letter as evidence that Jennifer Polakoff-Hewett (and by extension, Fifth Third) *had knowledge of the letter and its contents*. Without evidence that Polakoff-Hewett or Fifth Third ever received the letter, Morrison cannot rely on the letter for this purpose, and it should be stricken from the record." Defendant's Reply Brief in Support of Motion to Strike (ECF No. 55), p. 5 (italics in original).

Fifth Third's argument for striking this evidence altogether is unavailing. The Court will consider this evidence on summary judgment only to the extent that it provides background relevant to, as Morrison states, "the basis of [her] February 2017 discussion with Milner."

Fifth Third is correct that Morrison does not present any evidence that any of the decision makers involved in the investigation of her conduct or the decision to terminate her knew of the

letter. The letter serves only to affirm Morrison's *belief* that the "fit" comment was related to her race and explain why she mentioned it again several years later during her 2017 performance review. The Court will consider the letter in that limited context. In the end, this piece of evidence does nothing to change the Court's analysis of the motion for summary judgment. Fifth Third's motion to strike the letter is therefore granted in part and denied in part.

### E. Human Relations Commission Determination.

Fifth Third moves the Court to strike Morrison's Exhibit No. 14 (ECF No. 36-14), which is a copy of a 21-page document prepared by the Fort Wayne Metropolitan Human Relations Commission on August 15, 2018. The document summarizes in great detail the findings and conclusions of the Commission. *Id*. Fifth Third argues that the document is inadmissible because it is hearsay. Defendant's Brief in Support, p. 7 (citing *Dobosz v. Quaker Chem. Corp*., No. 2:15-CV-203, 2016 WL 4376528 (N.D. Ind. Aug. 16, 2016)).

In response, Morrison argues that the exhibit is admissible "pursuant to FRE [sic] 803(8) . . . because it sets forth factual findings from a legally authorized investigation that was conducted by METRO. FRE [sic] 803(8)(iii) permits reports containing factual findings from legally authorized investigation[s] to be admitted into evidence in civil suits." Plaintiff's Response in Opposition, p. 11.

In reply, Fifth Third argues that "[r]ather than address this case law [cited by Fifth Third], which provides statements within such determinations are hearsay, Morrison merely cites the general rule. Her undeveloped argument should be disregarded." Defendant's Reply in Support of Motion to Strike (ECF No. 55), p. 6.

In *Dobosz* the plaintiff submitted the EEOC's determination report "to attempt to create a

27

genuine issue of material fact" on summary judgment. This Court (Magistrate Judge Paul Cherry)

ruled that the report and the investigator's notes were inadmissible:

> The EEOC determination and notes are not admissible because they are inadmissible hearsay and are not probative. *See Stolarczyk ex rel. Estate of Stolarczyk v. Senator Int'l Freight Forwarding, LLC*, 376 F. Supp. 2d 834, 838 (N.D. Ill. 2005) (providing a thorough analysis of the admissibility of the EEOC investigator notes under Federal Rule of Evidence 803(8)(c)). The EEOC investigator's notes are merely notes made during interviews he conducted. Dobosz offers the statements in those notes for the truth of the matters asserted therein regarding essential job functions. Both parties have had an opportunity to present their case to this Court, including the opportunity to submit evidence that was offered in the course of the EEOC proceedings. Dobosz had the opportunity in this case to depose the witnesses interviewed during the EEOC investigation and to offer their deposition testimony. For example, he could have taken the deposition of Stephen Scott, the temporary replacement while Dobosz was on medical leave, but has not offered any testimony of Scott. "Justice requires that the testimony of witnesses be given in open court, under oath, and subject to cross-examination." *See Stolarczyk*, 376 F. Supp. 2d at 838-39 (citing *Tulloss v. Near N. Montessori Sch., Inc.*, 776 F.2d 150, 154 (7th Cir. 1985)); *Tulloss*, 776 F.2d at 154 (affirming the district court's refusal to admit the EEOC's entire investigation file, noting the district court's discretion, the potential for prejudice, and the opportunity to admit relevant evidence and testimony). Dobosz cannot rely on the inadmissible hearsay statements in the EEOC report to create a genuine issue of material fact.

> In addition, the Court cannot "evaluate the weight [the EEOC determination] deserves, if any, without understanding the evidence presented to the EEOC and whether that evidence is properly admissible in court. That sort of effort will rarely add much to the probative value of the admissible evidence that is actually submitted to the court. . . ." *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 733 (7th Cir. 2011) (internal citations omitted). Because Dobosz had the opportunity to present all relevant, admissible evidence to the Court on this instant motion, the Court declines to consider either the EEOC's determination or the EEOC investigator's notes.

*Dobosz v. Quaker Chem. Corp.*, No. 2:15-CV-203, 2016 WL 4376528, at *11-12.

In the present case, as Fifth Third points out, "Morrison argues that *some* of the

statements in the . . . Commission's determination were allegedly made by Milner or Ferree, and

'[i]n some instances, those statements are potential admissions against the Defendant's interests.' . . . Morrison does not identify to which [sic] supposed admissions she is referring. . . . The Court should strike the document." Defendant's Reply, p. 6. Indeed, Morrison states that she is relying on the exhibit because it contains "representations and statements of . . . Milner . . . and . . . Ferree that are reflected in the METRO report[]" and that those statements "are admissible to prove the truth of the matter asserted." Plaintiff's Response, p. 11.

Morrison's argument for the admissibility of parts of the Commission report is unavailing. The Court concludes that in this instance the determination report should be excluded from consideration based on this Court's reasoning and holding in *Dobosz*. Fifth Third's motion to strike Plaintiff's Exhibit 14 is granted and the Court will not consider the exhibit for purposes of summary judgment.

### III. Defendant's motion for summary judgment.

Turning finally to the motion for summary judgment, Fifth Third argues that Morrison was not meeting the bank's reasonable expectations and that it had a legitimate, nondiscriminatory reason for terminating her. Fifth Third insists that it fired Morrison, "because she violated Fifth Third's policy against Self-Dealing. Specifically, on February 14, 2017, Retail Risk and Administration Manager Angela Spry . . . discovered during a routine missing document audit that new joint accounts were opened for Morrison's daughter and son-in-law–Justin and Cheneta (nee Morrison) Robinson[]–in a manner that looked suspicious. Signature cards are required to open a new bank account, and Spry noticed that the signature cards had a signed signature date of January 13, 2017, but the accounts were opened in the system on January 19, 2017, which raised a red flag." Defendant's Brief in Support of Motion for

Summary Judgment (ECF No. 33), p. 1. Fifth Third maintains that Morrison was fired for violating bank policy and that race played no part in the termination decision. Fifth Third asserts that the events leading up to Morrison's termination, on which it based its decision, unfolded as follows:

Fifth Third Special Investigator Sara Swiergosz ("Swiergosz") investigated and determined that Morrison helped her adult children, who did not live in Fort Wayne, open the new joint bank accounts without going to the Fort Wayne Downtown financial center in person. Specifically, Swiergosz found that Morrison accomplished this by first soliciting support from a subordinate employee, Retail Personal Banker JillAnn Barnes ("Barnes")–asking Barnes to create signature cards without an account number and without opening an account at that time. Barnes told Swiergosz that when preparing the signature cards as instructed, Barnes noticed Morrison's daughter's last name was not updated in the system from prior accounts with her maiden name, but Morrison accepted the signature cards with her daughter's married name. Swiergosz further concluded that Morrison took the blank signature cards home and had them signed by her adult children when they were in town visiting Morrison. Swiergosz found that Morrison intended Barnes to open the accounts, but Barnes was not at work when Morrison returned the cards, so Morrison asked another subordinate employee, Retail Personal Banker Nickolas Smith ("Smith"), to open the account, stating there was a family emergency. While Smith told Swiergosz he felt it was wrong, he also shared he felt that he had to do it because he was instructed by Morrison, his supervisor. Smith also informed Swiergosz that had never met Morrison's daughter or son-in-law and Smith was also unsure of Morrison's daughter's last name on her identification. Smith further relayed to Swiergosz that he had made other changes to the adult children's accounts at Morrison's request, including updating addresses and Morrison's daughter's last name in the system.

In summary, Morrison took advantage of her role as the FCM, and made it easier for her adult children to open new accounts. Specifically, she facilitated their ability to skip steps and not present required paperwork in person that bank customers are required to do when opening accounts, adding an owner to accounts, changing a name on accounts, and changing an address on accounts. The actions also did not allow for a copy of rules and regulations to be presented to the adult children, a compliance issue. Based on the foregoing, Swiergosz concluded Morrison violated Fifth Third's Self-Dealing policy, and referred her findings to Employee Relations Consultant and Assistant Vice President, Jenean Ferree ("Ferree"). Ferree recommended termination to Morrison's Supervisor, Regional Manager John Milner ("Milner") because she felt it was a serious

violation given Morrison's leadership position and her involvement of subordinate
employees. Milner agreed and separated Morrison's employment, effective March
8, 2017.

*Id.*, pp. 1-3. Fifth Third argues that "[s]imply put, Morrison was separated for not meeting Fifth

Third's legitimate performance expectations for an FCM by violating its self-dealing policy." *Id.*,

pp. 3-4.

Morrison responds to Fifth Third's motion, and its proffered, nondiscriminatory reason

for her termination, as follows:

Prior to her termination, Morrison had a perfect work record with no disciplinary
actions, she earned consistently positive performance reviews while working
under Milner, and had been awarded for her superior performance, through raises
and bonuses.

There are material facts in dispute, that if construed in favor of Morrison, are
sufficient for a reasonable trier of fact to conclude that Morrison's limited action
in obtaining her relatives' signatures while away from the bank branch, did not
violate the actual signature card rules and practices in effect at the Defendant's
bank branches, nor did violate policy regarding the opening of the accounts. There
were multiple exceptions to the preferred method of obtaining in-branch
signatures, and not all of those exceptions were contained in the Defendant's
written policies or procedures for signatures or the opening of accounts.

The evidence debunks the Defendant's claim that Morrison violated its signature
card policy, because there were multiple exceptions to the general rule that
signature cards should be signed by a customer in person at a bank branch, one of
which was the exception that if a customer did not have time to come into a
branch to sign their signature card at the bank, an employee could take the card to
them for signing outside of the branch. This was not explicitly stated in the
written signature card procedure, but neither was the exception that the Defendant
admits to, that permitted employees to obtain off-site signatures at Membership
Advantage events. FCMs also could meet off site with a customer who did not
have time to come in to the bank to sign in person. There are a variety of reasons a
customer might not initially be able to come into a bank to sign a document; a
family emergency, or arrival from out of town after a bank has closed (especially
for the weekend) are just two examples, either of which have been asserted as the
reason Morrison took the signature cards to her relatives, but whichever reason is
accepted, under the circumstances Morrison had not violated the signature card

rule.

She also had not violated the rules against conflicts of interest or self dealing. Morrison had not opened, accessed, or administered her relatives' new accounts. Instead, she left those duties to two disinterested subordinates, who said nothing to Morrison to suggest they were uncomfortable or concerned about opening the accounts. She gained no benefit from her limited actions relating to the signature cards or the relatives new accounts. She also did not put her or her relations' interests above that of the Defendant, with the minor act of taking the signature cards for signing outside of the branch.

There are also genuine issues of material fact that further contradict the Defendant's claim that Morrison engaged in self-dealing or a serious, if any, violation of its policies or procedures. The initial fraud referral form that Angela Spry completed, stated the activity she was submitting for review was a "grey area", as opposed to anything clearly or blatantly violating the Defendant's rules.

Plaintiff's Memorandum in Opposition to Motion for Summary Judgment (ECF No. 40-1), pp. 6-7. In sum, Morrison does not dispute that she engaged in the acts alleged, such as taking "signature cards to her relatives," but contends that her conduct did not violate bank policy and her actions regarding the accounts at issue constituted, at most, a "minor act" that did not warrant termination.

### A. Race discrimination claims.

Morrison brings her race discrimination claims under Title VII and § 1981. Title VII provides that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Similarly, § 1981 states that "[a]ll persons within the jurisdiction of the United States shall have the same right ... to the full and equal benefit of the laws ... as is enjoyed by white citizens." 42 U.S.C. § 1981. "Because Section 1981

32

and Title VII claims are analyzed in the same manner, . . . the Court will simultaneously review [Plaintiff's] claims under Title VII and Section 1981." *Turner v. Hous. Auth. of Jefferson Cty*., 188 F.Supp.2d 1066, 1074-75 (S.D. Ill. 2002) (citing *Eiland v. Trinity Hosp*., 150 F.3d 747, 750 (7th Cir.1998)).

Morrison has chosen to proceed under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), which is one of the ways to prove Title VII employment discrimination. *Igasaki v. Illinois Dep't of Fin. & Pro. Regul*., 988 F.3d 948, 957 (7th Cir. 2021). That approach "requires a plaintiff to make a prima facie case of discrimination, at which point the burden shifts to the employer to offer a nondiscriminatory motive, and if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext." *Id*. (internal quotation omitted). To make a prima facie case, Morrison must show: (1) she belongs to a protected class; (2) she met Fifth Third's legitimate expectations; (3) she suffered an adverse employment action; and (4) another similarly situated employee outside of her protected class received better treatment. *Id*. The analysis is the same for race claims brought under § 1981. *Turner*, 188 F.Supp.2d at 1075.

In this case, the parties do not dispute that Morrison was a member of a protected class or that she suffered an adverse employment action. They do dispute whether Morrison can establish that she was meeting Fifth Third's expectations or that similarly situated employees were treated more favorably. Morrison contends that she was performing her job well and meeting or exceeding Fifth Third's reasonable expectations, while Fifth Third argues she was not meeting expectations because she violated bank policy. Fifth Third notes that this is a case in which "'the second [*McDonnell-Douglas*] prong and the pretext question merge.'" Defendant's Reply in

33

Support of Summary Judgment (ECF No. 48), p. 12 (quoting *Pittman v. Hous. Auth.*, 695

F.Supp.2d 866, 874 (N.D. Ind. 2010)).

### 1. Comparator issue.

Morrison claims that she can show that two similarly situated employees not in her

protected class were treated more favorably. She asserts that "Financial Services Manager Jackie

Lonis was a similarly situated white employee that was treated more favorably than Morrison,

because at the time of her alleged rules violation, she had the same supervisor, same job position,

and had engaged in similar conduct as to what [sic] Morrison was accused of by the Defendant.

Both Lonis and Morrison were FCMs, who shared the same superior, Regional Manager John

Milner." Plaintiff's Response in Opposition (ECF No. 40-1), p. 8. Morrison concedes that "the

name of the policy violation of which Lonis and Morrison were both accused differed, Lonis'

'gaming' was sufficiently similar in severity to the violation of the policy against 'self-dealing,'

to make Lonis a valid comparator to Morrison." *Id*. Morrison also asserts that "Financial Services

Manager A.C. was similarly situated to Morrison based on her job title, her supervisor, and the

name of the policy she admitted violating, but substantially different in all other material

respects. Morrison, at the actual time of termination, was told by Milner she was being

terminated for a problem with her 'leadership,' and only later informed the Defendant was

claiming she was fired for self-dealing. Morrison had had a discipline free work record, up until

when [sic] the Defendant punted her out the door. Unlike Morrison, A.C. had a pre-existing [sic]

history of poor leadership, and had been disciplined in the past for misusing her position, before

being caught red handed and admitting to the blatant, glaring self dealing violations for which

A.C. was finally fired." *Id*., p. 9. Even though A.C. was fired, Morrison nonetheless contends that

A.C. was treated more favorably because "[t]he disparity between the Defendant's tolerance for A.C., and its intolerance of Morrison is stark." *Id*., p. 10.

In its reply brief, Fifth Third argues that neither Lonis nor A.C. are proper comparators. Lonis is not a proper comparator, according to Fifth Third, because while Lonis was not fired (after Fifth Third concluded she had *not* violated bank policy) she "was disciplined *despite* the fact her actions did not violate Fifth Third's policy." Defendant's Reply in Support of Motion for Summary Judgment (ECF No. 48), p. 2. As to A.C., Fifth Third notes that "Morrison herself contends 'an examination of [A.C.'s] termination, reveals significant differences existed that disqualify her from being [a] comparator to Morrison. . . . Oddly, Morrison suggests elsewhere in her briefing that A.C. is a comparator who was given greater leniency. Morrison's self-contradictory argument is not supported by the record. Morrison assumes A.C. had prior leadership issues and assumes Fifth Third was aware of A.C.'s alleged long-running violations the entire time they were occurring. There is no such evidence, and if anything, the separation of a white FCM, A.C., by Milner also for a self-dealing policy violation cuts against Morrison's claims by showing individuals outside the protected category were treated the same." *Id*.

In sum, Fifth Third argues that the A.C. and Lonis situations were distinguishable and therefore they are not proper comparators, while Morrison argues that they *were* similarly situated because they were both FCMs who were investigated for wrongdoing but who were treated more favorably because Lonis was not fired and A.C. was afforded greater "leniency" by Fifth Third before she was terminated.

As the Seventh Circuit has explained:

To determine whether employees are similarly situated, courts ask "whether the

> other employees' situations were similar enough to the plaintiff's that it is reasonable to infer, in the absence of some other explanation, that the different treatment was a result of race or some other unlawful basis." *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 730 (7th Cir. 2011). In cases such as this, where the plaintiff alleges the employer disciplined him more harshly than his comparator, "'the most-relevant similarities are those between the employees' alleged misconduct, performance standards, and disciplining supervisor,' rather than job description and duties." *Coleman* [*v. Donahoe*], 667 F.3d [835,] 849 [(7th Cir. 2012)] (quoting *Rodgers v. White*, 657 F.3d 511, 518 (7th Cir. 2011)). "[T]he critical question is whether [the employees] have engaged in conduct of comparable seriousness." *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 689 (7th Cir. 2007). Conduct may be comparably serious if it violates the same rule or is of a similar nature. *Id.*

*de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 559 (7th Cir. 2019). There is a factual dispute here, but not a material one. "A fact is 'material' if it 'might affect the outcome of the suit' under the applicable substantive law." *H-D U.S.A., LLC v. SunFrog, LLC*, 311 F.Supp.3d 1000, 1010 (E.D. Wis. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *Borcky v. Maytag Corporation*, 248 F.3d 691, 695 (7th Cir. 2001) ("Factual disputes are 'material' only when they 'might affect the outcome of the suit under the governing law.'") (quoting *Oest v. Illinois Department of Corrections*, 240 F.3d 605, 610 (7th Cir. 2001)); *Liu v. T & H Machine, Inc.*, 191 F.3d 790, 796 (7th Cir. 1999) (mere existence of some alleged factual dispute insufficient to defeat properly supported motion for summary judgment).

The disputed issue in this instance is whether the circumstances underlying Lonis's and A.C.'s adverse employment actions prove or disprove that they were treated more favorably. But even assuming, *arguendo*, that Morrison's evidence is sufficient to establish the fourth prong of her prima facie case, she fails to show pretext, which dooms her case.

## 2. Pretext issue.

It is undisputed that Morrison had always received positive performance reviews during

her employment at Fifth Third and was never subject to discipline or any other adverse employment action. Morrison insists that "[a]t the time of her termination, Morrison had been meeting or even exceeding the Defendant's reasonable expectations[]" and that "[p]rior to her termination, Morrison had a perfect work record with no disciplinary actions, she earned consistently positive performance reviews while working under Milner, and had been awarded for her superior performance, through raises and bonuses." Plaintiff's Memorandum in Opposition (ECF No. 40-1), pp. 5-6. This all began to change on February 15, 2017, eight days after Morrison's last performance review with Milner,[3] when Swiergosz began the investigation into Morrison's alleged self-dealing. Swiergosz Decl. (ECF No. 33-4), ¶ 3 ("On February 15, 2017, I was assigned to investigate irregularities with signature cards at the Fort Wayne Downtown financial center."). Accordingly, the issue of whether Morrison was meeting Fifth Third's expectations and the issue of pretext merge.

Fifth Third submits an affidavit from Milner recounting the chain of events that led to Morrison's termination:

5. In February 2013, Morrison submitted an internal application to be the FCM of the financial center on Lima Road.

6. When Morrison did not get the position, she asked me why, and I told her she was not best candidate and something to the effect of, "We need to best-fit talent."

---

[3] Morrison states that she "met with Milner on February 7, 2017[,] for what would be my final performance review." Plaintiff's Response in Opposition (ECF No. 36-1), p. 6. Milner states in his affidavit that "[i]n January 2017, I met with Morrison to discuss her year-end performance review[.]" Milner Decl. (ECF No. 33-3), ¶ 13. The proximity of the final performance review in relation to Morrison's termination on March 8, 2017, is an issue as to Morrison's retaliation claim (as discussed below). However, the discrepancy about whether it took place in January of 2017 or on February 7, 2017, is not, in the end, material. For purposes of summary judgment, the Court will assume that the review occurred on the date Morrison alleges–February 7, 2017, one month before her termination.

I could tell that she was not happy with that answer, so I reached out to Employee Relations to facilitate further discussion.

7. I never discussed the foregoing exchange, or any subsequent related exchange, with Jenean Ferree, Angela Spry or Sara Swiergosz.

8. In Spring of 2014, Morrison submitted an internal application to be the FCM of the financial center on Dupont Road, and she was not selected.

9. In our communications regarding the Dupont Road position, I told Morrison that some of the metrics I based the decision on were incorrect when I viewed them.

10. I asked Morrison what I could do to help her in her role, and Morrison asked me for help with a business plan for her branch so she could be successful. I did so, and to Morrison's credit, I felt she executed the plan. Morrison did not say she believed the decision was based in whole or part on her race.

11. In 2014, another FCM position became open at the Lima Road financial center, and I offered the position to Morrison. She declined.

12. I conducted Morrison's performance reviews for the years 2013 through 2016. In 2013 she achieved a "meets expectations" rating, and in 2014 and 2015, she achieved an "above expectations" rating, and in 2016, she achieved an "exceeds" rating. She was on track to has another "exceeds" year in 2017 before the policy violations required her termination.

13. In January 2017, I met with Morrison to discuss her year-end performance review, which was again an overall exceeds expectations.

14. In March 2017, Employee Relations Consultant and Vice President, Jenean Ferree, informed me that a Special Investigator, Swiergosz, found that Morrison violated Fifth Third's policy against self-dealing.

Milner Declaration (ECF No. 33-3) (paragraph numbers in original). Milner also testified that

following the investigation, the following events occurred:

16. Ferree and I agreed that the violation was especially egregious because Morrison had instructed her subordinates to assist her with the adult children's accounts in a manner that violated Fifth Third policies. We agreed that this was not acceptable in her role as a manager of the facility, as the FCM, and I agreed with Ferree's conclusion that it violated Fifth Third's policy against self-dealing.

17. Ferree recommended that I terminate Morrison's employment for the serious violation of the self-dealing policy. I agreed and terminated Morrison's employment effective March 8, 2017.

18. I had never had any employee under my supervision, let alone an FCM, violate the self-dealing policy before Morrison did so.

19. Following the termination of Morrison's employment, I filled Morrison's position with an employee who was also black because of his qualifications, professionalism and extensive network.

*Id.* (paragraph numbers in original).

Swiergosz stated in her affidavit that after she completed her investigation she forwarded the results "to Employee Relations to review. Employee relations will communicate a final outcome with Bank Protection." Swiergosz Decl. (ECF No. 33-4), p. 12, Exh. A (Investigation Report). Swiergosz also testified as follows:

27. Based on this investigation, I reached several conclusions including, but not limited to, the following:

   a. I substantiated the claims of self-dealing, as Morrison admitted she made the decision to not follow policy to benefit her family.

   b. I found additional policy violations, including the way the change of addresses for Morrison's adult children were listed in the bank system, and the failure to obtain a marriage license when updating Cheneta's name in the Bank system.

   c. Morrison's subordinate employees, Barnes and Smith, felt uncomfortable and/or feared retaliation if they did not follow Morrison's requests.

28. At the time I completed my investigation in February 2017, I did not know Morrison had complained of any comments by John Milner.

Swiergosz Decl. (ECF No. 33-4), p. 6.

Again, this is a case in which the second prong and the pretext question merge. Fifth

39

Third maintains that Morrison was fired for not meeting the bank's reasonable expectations because she violated bank policy, which is also Fifth Third's proffered, nondiscriminatory reason for firing her. Morrison attempts to establish pretext, that is, that Fifth Third's proffered reason was a lie, by contending that Milner's "fit" comment from 2013, which she raised with him again during her 2017 performance review, shows that the real reason she was fired was because of her race.

Morrison testified in her deposition that her conversation with Milner during her 2017 performance review went as follows: "I did talk to John on 2017 [sic] during my performance review about not feeling comfortable being able to apply for the larger branches because of his comment about don't fit, and that was made in 2017." Morrison Depo. (ECF No. 33-2), p. 29 (internal page number 116). She further testified: "That was a conversation that was had at my performance review with John Milner. I explained to him that I didn't feel comfortable posting for positions because of his I do not fit comment. And I was afraid that the first time something went wrong, he would say, see, I told you she didn't fit. That was his and not my position." *Id*., p. 32 (internal page number 132).

Milner states in his affidavit that "[i]n February 2013, Morrison submitted an internal application to be the FCM of the financial center on Lima Road. . . . When Morrison did not get the position, she asked me why, and I told her she was not best candidate and something to the effect of, 'We need to best-fit talent.'" Milner Decl. (ECF No. 33-3), pp. 2-3. Fifth Third concedes that Milner used the "fit" remark in 2013: "Morrison was not selected for the lateral position, and Milner told Morrison something to the effect–'we need to best-fit talent.'" Defendant's Brief in Support (ECF No. 33), p. 12 (quoting Milner Decl.). In his declaration,

Milner testified that "[w]hen Morrison did not get the position, she asked me why, and I told her she was not best candidate and something to the effect of, 'We need to best-fit talent.'" Milner Decl. (ECF No. 33-3), p. 5, ¶ 6. Morrison asserts that Milner "told me I 'didn't fit.' He did not say he needed to 'right-fit talent.' He could not give me a single reason for his belief that I was denied promotion into the positions I had sought at either bank branch just the *vague comment* that I didn't 'fit.'" Morrison Decl. (ECF No. 36-8), p. 3 (italics added). Tellingly, Morrison also states that "[w]hen I could not obtain a satisfactory answer from Milner about why he thought I would not 'fit' or did not 'fit,' I *concluded* it was because of my color/race." *Id*. (italics added). The factual dispute about Milner's exact phrasing is immaterial–it is undisputed that in 2013 he referred to Morrison as not being a good or proper "fit" at another branch. What is material to the present analysis is Morrison's statement that she "concluded" that Milner's "vague comment" referred to her race, because Morrison's entire case rests solely on that conclusion and on leap-of-faith inferences she draws from it.

As Fifth Third notes, "[e]ven assuming *arguendo* that Milner's alleged statement that Morrison was not the 'best fit' implies a race or color bias, the comment is not sufficient direct evidence to support Morrison's claims. The Seventh Circuit has repeatedly held that '[o]ne stray remark is not enough' to survive summary judgment." Defendant's Brief in Support (ECF No. 33), p. 17 (quoting *Cherif v. McDonald*, 617 F.App'x 571, 574-75 (7th Cir. 2015)). Fifth Third argues that "[b]eyond the fact Morrison can only point to one stray remark more than three years before her termination, an employer can overcome even direct evidence of discrimination and win summary judgment if the employer points to an independent justification for termination." *Id*. (citing *Glanzman v. Metro. Mgmt. Corp.*, 290 F.Supp.2d 571, 579-80 (E.D. Pa. 2003)). Fifth

41

Third argues that it had independent justification to fire Morrison and that Milner's "fit" comment is insufficient to establish that that reason was pretextual. *Id*. (citing *Anterio v. City of High Springs Fla*., 762 F. App'x 891, 898 (11th Cir. 2019) (affirming summary judgment finding the plaintiff failed to present evidence that the employer's offered explanation that the plaintiff was not the "right fit" was pretextual)).

Even Morrison admits that "[a]lthough ['fit' is] a potentially neutral word when viewed in isolation, viewing this Milner's choice of verbiage within the surrounding context in which he made it, creates a reasonable inference that Miller's comment was of a racially biased tone and complexion." Plaintiff's Response in Opposition (ECF No. 40-1), p. 10. And by "surrounding context," Morrison means her observation that "[o]ut of twenty-one (21) total [FCMs] during the period of January 1, 2016[,] through October 17, 2018, only three were African Americans, while the other eighteen (18) were non-black (and of those, nearly all were whites)." Plaintiff's Response in Opposition (ECF No. 40-1), p. 11. Morrison insists that "[t]he comparison of the number of black FCMs to non-black FCMs reveals a significant difference in the proportions of the two groups of employees, suggesting an underrepresentation of black FCMs in the bank branches supervised by . . . Milner. That, when viewed along side Milner's 'fit' comment, and the differential disciplinary treatment he issued to Morrison compared to similarly situated white FCM Ms. Lonis, create an inference of more than coincidental racially disparate practices." *Id*.

Fifth Third replies by arguing that "Morrison merely compares the number of non-Black FCMs under Milner to the number of Black FCMs under Milner, and posits that the ratio suggests underrepresentation of Black FCMs. But these general statistics do not establish discriminatory intent. Moreover, Morrison does not compare Milner's ratio to other Regional

Managers or to other banks, whether in the Fort Wayne area, Indiana, or nation-wide."

Defendant's Reply (ECF No. 48), p. 11. Fifth Third then notes that "'[A] mere statistical

imbalance in itself does not constitute a discriminatory practice under Title VII.'" *Id*. (quoting

*Babrocky v. Jewel Food Co*., 645 F.Supp. 1396, 1423 (N.D. Ind. 1986)); also citing *Buchanan v.*

*Kelly*, 592 F.App'x 503, 506 (7th Cir. 2014) ("general statistics alone do not plausibly suggest

that Kelly himself acted with racially discriminatory intent in this particular case."); *Cole v.*

*Lincolnshire Health Care Center*, No. 2:04-CV-262, 2005 WL 2614934, at *16 (N.D. Ind. Oct.

14, 2005) ("Standing virtually alone . . . statistics cannot establish a case of individual disparate

treatment[.]"); *Movement for Opportunity v. General Motors*, 622 F.2d 1235, 1277 (7th Cir.

1980) ("No inference of discrimination can be drawn from statistics that relate solely to the

sexual or racial makeup of a job level as a whole.").

Evidence of pretext is "evidence that the employer's proffered reason for the discharge is

'patently inconsistent with the evidence before the court.'" *Smeigh v. Johns Manville, Inc*., No.

1:09-CV-0414, 2010 WL 3781492, at *6 (S.D. Ind. Sept. 22, 2010), *aff'd*, 643 F.3d 554 (7th Cir.

2011) (quoting *Mack v. Great Dane Trailers*, 308 F.3d 776, 784 (7th Cir. 2002) (in turn quoting

*Markley Enters., Inc. v. Grover*, 716 N.E.2d 559, 565 (Ind.Ct.App.1999))). "'Pretext means a

dishonest explanation, a lie rather than an oddity or an error.'" *Id*. (quoting *O 'Regan v.*

*Arbitration Forums, Inc*., 246 F.3d 975, 983 (7th Cir. 2001)). "[T]he Court must analyze whether

or not [defendant's] proffered explanation is a lie to cover up unlawful retaliation." *Id*.

This Court addressed the issue of pretext in the case of *Moore v. Park Center, Inc*., in

which the plaintiff alleged retaliatory discharge. This Court (Magistrate Judge Roger B. Cosbey),

held as follows:

On this record, no reasonable jury could infer that Park Center's proffered reason for terminating Moore–his numerous performance problems–was pretextual. "Pretext is more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Silverman* [*v. Bd. of Educ. of City of Chicago*], 637 F.3d [729], 743-44 [7th Cir. 2011] (citation and internal quotation marks omitted); *see also Forrester v. Rauland–Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006) (articulating that pretext is a "deliberate falsehood"). Here, in an effort to establish pretext, Moore baldly asserts that he was a "good employee" and that all of Park Center's criticisms of his performance are false.

Of course, as explained earlier, *Moore's self evaluation of his own performance is irrelevant*, as "[t]he perception of the decisionmaker is controlling." *Stockwell v. City of Harvey*, 597 F.3d 895, 903 (7th Cir. 2010). To reiterate, Hartley had received two lengthy complaints about Moore's performance before he ever reported the sexual harassment allegations to her or Wallace, and additional performance infractions came to light during the investigation of the allegations. Moore even admitted in his deposition that he committed one of the violations. . . and thus there is no dispute that this performance deficiency occurred.

And as explained earlier, *even if Hartley was mistaken about Moore's purported violation of Park Center's HIPAA and confidentiality policies, this is of no moment*, as "[e]ven if the reasons for [the plaintiff's termination] were mistaken, ill considered or foolish, so long as [the defendant] honestly believed those reasons, pretext has not been shown." *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000); *see Roberts* [*v. Separators, Inc.*], 172 F.3d [448], 453 [7th Cir. 1999] (emphasizing that it is not enough that the plaintiff simply prove that he did not commit the performance infractions for which he was terminated–"he must prove that the defendant did not honestly believe he had made them"). Here, even if Moore had been able to establish his prima face case, there is simply no evidence upon which to infer that Park Center's proffered reason for his termination was "phony" or a lie, ringing the death knell for his claim.

*Moore v. Park Ctr., Inc.*, 830 F.Supp.2d 592, 603-04 (N.D. Ind. 2011). The same applies here:

Morrison cannot rely on her assertions that she "did not commit the performance infractions for

which [she] was terminated." She must present evidence that Fifth Third's explanation was a lie

*and* that her race played a dispositive role in her termination. *See Maguire v. Marquette*

*University*, 814 F.2d 1213, 1216-18 (7th Cir. 1987); *Sherkow v. Wisconsin*, 630 F.2d 498, 502

44

(7th Cir. 1980) (both stressing that the plaintiff must show not only a false reason but also a

causal chain in which race or another forbidden criterion plays a dispositive role). As the Seventh

Circuit has explained, "[i]t is easy to confuse 'pretext for discrimination' with 'pretext' in the

more common sense (meaning any fabricated explanation for an action), and to confound even

this watery use of 'pretext' with a mistake or irregularity. That is what happened here. . . . If you

honestly explain the reasons behind your decision, but the decision was ill-informed or

ill-considered, your explanation is not a "pretext." *Pollard v. Rea Magnet Wire Co.*, 824 F.2d

557, 559 (7th Cir. 1987). "A district judge does not sit in a court of industrial relations. No

matter how medieval a firm's practices, no matter how high-handed its decisional process, no

matter how mistaken the firm's managers, Title VII and § 1981 do not interfere. . . . The

employee must show that race is the dispositive factor. *Dale v. Chicago Tribune Co.*, 797 F.2d

458, 462 (7th Cir.1986). Pollard did not." *Id* at 560-61. Morrison's Title VII and § 1981 claims

fail for the same reason.

      Morrison's race discrimination claim is based on inferences upon inferences, conclusions,

and speculation. Morrison does not dispute that Fifth Third investigated and concluded that she

had violated bank policy. She disputes that she did so, and claims that her actions were not

violations of policy or that they were minor infractions that did not warrant termination, but her

beliefs do not constitute evidence of pretext. As stated many times above, Morrison's burden on

summary judgment is to muster sufficient evidence to show that Fifth Third's proffered

nondiscriminatory reason for firing her was a lie–a smoke screen to cover discriminatory animus.

"While all reasonable inferences must be drawn in favor of Plaintiff, Plaintiff cannot create a

genuine issue of material fact through mere speculation or the building of inference upon

inference. Instead, inferences must be supported by facts in the record." *Bell v. The ABB Grp., Inc*., No. 13-CV-1338, 2016 WL 51386, at *3 (S.D. Ill. Jan. 5, 2016). "[T]he plaintiff's presentation falls short, because it is supported solely by an untenable chain of inferences upon inferences, which rely for key connections on nothing more than speculation." *Williams v. Kuryakyn Holdings, LLC*, No. 18-13606, 2021 WL 1313358, at *4 (E.D. Mich. Apr. 7, 2021). "[Plaintiff's] naked attempt to 'build inference upon inference' in order to establish an inference of discrimination is without merit. . . . The chain of inferences here is so vague and conclusory, and so far removed from the actual employment decision that is being challenged, that a reasonable fact-finder could not draw even the weakest inference of discrimination from these events." *Glass v. Lahood*, 786 F.Supp.2d 189, 219 (D.D.C. 2011), *aff'd*, No. 11-5144, 2011 WL 6759550 (D.C. Cir. Dec. 8, 2011) (internal citations omitted). "Plaintiff would have this Court infer that a statement made to Morgan in 2003 implied a race-based motive, but such an inference would require a sizeable leap, and nonetheless it would be difficult to apply a statement from 2003 to Plaintiff's claim for discrimination arising three years later. Indeed, this Court will not pile inference upon inference[.]" *Charles v. JetBlue Airways Corp*., No. CIV.A. 08-40, 2009 WL 273206, at *10 (E.D. La. Jan. 26, 2009). "[A plaintiff] cannot create a genuine issue of material fact through mere speculation or the building of inference upon inference." *Jones v. GT Contracting Corp*., No. CV-14-3539, 2016 WL 704319, at *8 (D. Md. Feb. 23, 2016) (citing *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)). "Plaintiff cannot point to any material contained in the record and instead piles inference upon inference based on personal belief and conclusory allegations to support his claim of retaliation." *Bodrick v. U.S. Dep't of Homeland Sec*., No. 3:09-CV-450, 2011 WL 3501871, at *13 (W.D.N.C. Aug. 10, 2011). "While all

46

justifiable inferences must be drawn in favor of the nonmovant, *Miltier v. Beorn*, 896 F.2d 848

(4th Cir.1990), the non-moving party cannot create a genuine issue of material fact through mere

speculation or the building of inference upon inference." *Stovall v. Smith*, 962 F. Supp. 692, 694

(D. Md. 1996), *aff'd sub nom. Stovall v. Pepsi Cola DCLP*, 107 F.3d 867 (4th Cir. 1997) (citing

*Beale v. Hardy*, 769 F.2d 213 (4th Cir. 1985)).

Morrison's race discrimination claims, and her retaliation claim (discussed below), rest

solely on her conclusion that Milner's "fit" comment in 2013 referred to her race, the fact that

she brought up the comment again four years later during her 2017 performance review, and her

repeated but irrelevant assertion that the conduct she was alleged to have engaged in did not

violate bank policy or was too minor to warrant termination. Based on that, Morrison argues that

a reasonable inference can be drawn that her termination was the result of racial animus and in

retaliation for her having complained about it. Her argument is insufficient to show a racially

motivated termination, not only because it is built on conclusions and unsupported inferences,

but because it ignores the fact that whether she violated policy is irrelevant. It is Fifth Third's

*belief* that is relevant, and Morrison presents no evidence or even a well-founded argument to

refute that the bank fired her because it believed she had engaged in self-dealing.

### B. Retaliation claim.[4]

---

[4] "In the Seventh Circuit, courts 'generally apply the same standards to Title VII [of the Civil Rights Act of 1964] and [§] 1981 race discrimination claims at the summary judgment stage.'" *Kelly v. Project of Quad Cities, Inc.*, No. 4:19-CV-04078, 2021 WL 1566444, at *4 (C.D. Ill. Apr. 21, 2021) (quoting *Smiley v. Columbia Coll. Chi.*, 714 F.3d 998,1002 (7th Cir. 2013)) (also citing *James v. Get Fresh Produce Inc.*, No. 18-C-4788, 2018 WL 6199003, at *8 (N.D. Ill. Nov. 28, 2018) ("[T]he substantive standards and methods of proof that apply to claims of racial discrimination and retaliation under Title VII also apply to claims under § 1981.")).

Morrison's retaliation claim arises solely from her conversation with Milner during her 2017 performance review. Morrison asserts that "[d]uring her February 2017 performance review, Plaintiff told her Regional Manager/supervisor, John Milner, she felt discouraged from applying for other positions because of being told she 'didn't fit.' Plaintiff indicated her belief that even if her application had been accepted, she would be held to a double standard based on whether she 'fit.'" Complaint, pp. 2-3, ¶ 14. The word "retaliation" does not appear anywhere in Morrison's Complaint; she did, however, check the box for "retaliation" on her EEOC Charge. In her memorandum in opposition to summary judgment, Morrison "contends that she was terminated in retaliation for prior objections she had made to discriminatory treatment." Plaintiff's Memorandum (ECF No. 40-1), p. 2. She elaborates on this argument later in her brief, explaining the underlying basis for her retaliation claim:

> [Plaintiff's] . . . discussion with Milner was sufficient to constitute a protected action, because the evidence shows Milner knew what Morrison's concern about his usage of the term "fit" meant, and thus would have known she was not just objecting to a decision he had made that Morrison disagreed with, but she was objecting to a decision and/or action that had been based on Morrison's race.

> Morrison had previously communicated to Human Resources and her coworker Heather Bontrego that Morrison felt she had been treated differently because of her race, and Morrison's 2013 letter to Human Resources expressed her concern that Milner's use of the term "fit" reflected a motivation for the denial her promotions due to her race, which was "not of the majority" race. There is a reasonable inference, that an employee's allegation to an employer's Human Resources personnel about discrimination, would be communicated to the supervisor under whom the employee worked, in order to address the complaint, so a reasonable inference exists that even if Morrison had not directly told Milner in 2017 she thought his use of the term "fit" referred to her race, and showed Milner's decision making was motivated by her race, Milner still was informed of Morrison's concerns about racial discrimination in his hiring and promotion decisions. . . . Against the backdrop of these facts, a reasonable inference exists from which to conclude, that when Morrison confronted Milner about his

48

reference to her about "fit" and/or alleged "lack of fit" during the February 7, 2021[,] performance review, *this was sufficient to assert her new objection to what she reasonably believed was racial discrimination, and put him on notice that she was complaining about racial discrimination and racially discriminatory treatment.*

*Id.*, pp. 16-17 (italics added). So, Morrison contends that by bringing up Milner's "fit" comment during her 2017 performance review she engaged in protected activity. Assuming that is true, she must also show that there was a causal connection between that protected activity and her termination. She attempts to do that by arguing that the timing of her termination, coming as it did about a month later, is sufficiently suspicious so as to support a claim for retaliation.

Fifth Third replies to Morrison's argument as follows:

Morrison's arguments to support her retaliation claim also miss the mark. She turns retaliation on its head and argues Milner retaliated against her although she never engaged in protected activity. . . . Rather than a retaliation claim, Morrison's argument is merely an extension of her discrimination claim. As for the causation element, Morrison attempts to bring "context" to Milner's alleged "fit" comment, but the context she focuses on would remove Milner's supposed motivation to retaliate. In suggesting Milner and Fifth Third knew of the supposed connection between the "fit" comment and Morrison's race as far back as June 1, 2013, she removes any new motivation Milner may have gained when she allegedly raised the issue in her 2017 performance review.

Defendant's Reply (ECF No. 48), pp. 2-3. Elaborating on this argument, Fifth Third asserts:

[The June 1, 2013, letter] severely undermines her argument that the 2017 performance review spurred Milner to retaliate. Morrison claims Milner and HR knew the "fit" comment since 2014 and had connected the comment to Morrison's race. If this is true, then when she raised the "fit" comment during her performance review, she raised no new allegations, or any new information of which HR was not already aware. Under Morrison's theory, the performance review did not provide any new motive for Milner to preemptively "retaliate" against her that he would not have had since 2014. Had Milner had any motivation to retaliate since 2014, it makes little sense he would give her generally positive reviews only to suddenly fire her. . . . Moreover, Milner was not even involved in the discovery of Plaintiff's policy violations, rather, it was Spry.

49

Morrison's timing argument is also misleading. By stringing together phrases like "only a few days" and "another week and a half later," Morrison artificially closes the two-month gap–from January to March–between her performance review and her termination. . . .  Her attempt to correlate the performance review with Spry's report, Swiergosz's investigation, and Ferree's recommendation to terminate is pure misdirection. It is undisputed that none of them knew about the exchange between Morrison and Milner during her performance review. . . . No correlation can be drawn.

*Id*., pp. 13-14.

Morrison argues that when she brought up the "fit" comment in her 2017 performance review, it constituted statutorily protected activity, and since she was fired about a month later, her termination was in retaliation for having done so. When questioned by Fifth Third's counsel about her retaliation claim, Morrison testified as follows:

Q. Do you have any other facts to support your claim that you were retaliated against?

A. The only fact I have to that I was retaliated against was the fact that I brought up the don't fit on 2/7 of 2018 and was terminated on 3/8 of '18.[5]

Q. Any other facts that you claim –

A. No.

Q. –support your allegation of retaliation?

A. No.

Q. And are you claiming that it was Mr. Milner that retaliated against you or others?

A. Mr. Milner.

Morrison Depo. (ECF No. 48-2), p. 12 (internal page number 199).

_____

[5] Morrison clearly misspoke here. It is undisputed that her final performance review and her termination both occurred in 2017, not 2018.

"To survive summary judgment on a Title VII retaliation claim, an employee 'must produce enough evidence for a reasonable jury to conclude that (1) she engaged in a statutorily protected activity; (2) the [defendant] took a materially adverse action against her; and (3) there existed a but-for causal connection between the two.'" *Stinson v. Cty. of Cook*, No. 18-CV-1614, 2020 WL 6870816, at *10 (N.D. Ill. Nov. 23, 2020 (quoting *Abrego v. Wilkie*, 907 F.3d 1004, 1014 (7th Cir. 2018)). "Courts 'consider the evidence as a whole and conduct a 'straightforward inquiry: Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the [materially adverse action]?'" *Id.*

Protected activity is "'more than simply a complaint about some situation at work, no matter how valid the complaint might be.'" *Garza v. Illinois Inst. of Tech.*, No. 17-C-6334, 2018 WL 264198, at *3 (N.D. Ill. Jan. 2, 2018) (quoting *Cole v. Bd. of Trustees of N. Ill. Univ.*, 838 F.3d 888, 901 (7th Cir. 2016)). "The complaint instead must indicate discrimination on the basis of membership in a protected class." *Id.* (citing *Cole*, 838 F.3d at 901); (also citing *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008) ("although 'a report of discrimination to a supervisor may be statutorily protected activity . . . , the report must include a complaint of national origin discrimination or sufficient facts to raise that inference.'")).

Even assuming Morrison engaged in protected activity simply by bringing up her concerns about the "fit" comment to Milner during her 2017 performance review, she also must show that "there existed a but-for causal connection" between her comments and her termination (i.e., the fourth prong). Morrison argues that the "causal connection" is shown by the mere fact that she expressed her concerns and was fired approximately a month later. And, like her race claim, this argument completely ignores the intervening investigation and Fifth Third's

51

conclusion that Morrison had violated bank policy.

"It is well established that temporal proximity [i.e., suspicious timing] is rarely sufficient to establish–or even raise a fact issue about–retaliation[.]" *Eib v. Marion Gen. Hosp., Inc.*, No. 1:17-CV-277, 2019 WL 3774234, at *5 (N.D. Ind. Aug. 12, 2019). *See also*, *Evans v. Patrick Aluminum, Inc.*, 2018 WL 2445544, at *7 (S.D. Ind. May 30, 2018) ("Speculation based on suspicious timing alone does not support a reasonable inference of retaliation; instead, plaintiffs must produce facts which somehow tie the adverse decision to the plaintiffs' protected actions."); *Boylan v. Ball State University*, 2019 WL 3484161, at *6 (S.D. Ind. July 31, 2019) ("Speculation based on suspicious timing alone, however, does not support a reasonable inference of retaliation.") (citing *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 883 (7th Cir. 2014) ("[M]ere temporal proximity between [the statutorily protected activity] and the action alleged to have been taken in retaliation for that [activity] will rarely be sufficient in and of itself to create a triable issue.")).

Also, an argument based on temporal proximity can be refuted when intervening events come into play. As another district court explained in a case in which the plaintiff alleged he was discharged in retaliation for filing a workers' compensation claim:

> Smeigh's temporal proximity argument ignores the reality that the same chain of underlying events led to both his termination and his workers' compensation benefits. Stated differently, there was an intervening cause . . . for his termination. Even drawing all reasonable inferences squarely in Smeigh's favor, these facts reduce the strength of Smeigh's timing evidence to "a wash." *Hudson*, 412 F.3d at 786-87 (granting summary judgment and recognizing that temporal proximity evidence was "a wash" where the same incident led to both the termination and the workers' compensation claim); *see also Crye v. Caterpillar, Inc.*, 4:07-CV-35, 2008 WL 5111349, at *7 (N.D.Ind. Dec.3, 2008) (granting summary judgment where employee was unable to establish causal connection due to intervening event of being captured on video taking lengthy breaks); *Caskey v. Colgate-*

> *Palmolive Co.*, 535 F.3d 585, 594 (7th Cir. 2008) (granting summary judgment where employee was unable to establish causal connection due to intervening event of unexcused absences).
>
> Given its context, Smeigh's timing evidence falls flat. By itself, this evidence is insufficient to establish the requisite causal connection for purposes of summary judgment. As the Seventh Circuit has recognized, temporal proximity "is rarely sufficient in and of itself to create a jury issue on causation." *Hudson*, 412 F.3d at 787; *see also Tolbert v. Con-Way Transp. Servs., Inc.,* No. 4:04-CV-0082, 2005 WL 1476298, at *4 (S.D.Ind. June 15, 2005) ("Temporal proximity of discharge and notice of a claim may be sufficient, *with additional evidence*, to raise a genuine issue as to the reason for his discharge.") (emphasis added). Further, the need for additional evidence is especially acute where, as here, there is an intervening cause for the discharge.

*Smeigh v. Johns Manville, Inc.*, No. 1:09-CV-0414, 2010 WL 3781492, at *6 (S.D. Ind. Sept. 2, 2010), *aff'd*, 643 F.3d 554 (7th Cir. 2011).

Morrison's retaliation claim fails as a matter of law for the same reason–she does not show, or raise a material fact issue about, a causal connection between her alleged protected activity and her termination. Her retaliation claim is based on two assertions: 1) she brought up Milner's "fit" comment from several years earlier during her 2017 performance review; and 2) she was fired a month later. Like her race discrimination claim, this theory ignores the intervening investigation into her alleged self-dealing (however misguided or wrong she insists it was). Even assuming that Morrison's conversation with Milner constituted protected activity–an inference the Court draws in her favor for purposes of summary judgment–she fails to establish the requisite causal connection. Her only evidence on that crucial issue is what she characterizes as the suspicious timing of her termination, which as noted is rarely sufficient to support a retaliation claim. And like the plaintiff in *Smeigh*, Morrison's argument ignores the intervening events that resulted in her termination, rendering her suspicious timing argument unavailing. For

the foregoing reasons, Morrison fails to refute Fifth Third's proffered, nondiscriminatory explanation for its decision (and, by extrapolation, fails to establish that she was performing her job to Fifth Third's reasonable expectations at the time of her discharge). Accordingly, Fifth Third is entitled to summary judgment on Morrison's race and retaliation claims.

### C. Punitive damages claim.

Fifth Third also moves for summary judgment on Morrison's claim for punitive damages. Given the Court's conclusion that Fifth Third is entitled to summary judgment on Morrison's race and retaliation claims, this issue is MOOT.

### CONCLUSION

Ms. Morrison's race and retaliation claims fail to survive summary judgment. Even after drawing all reasonable inferences in her favor, her evidence fails to establish a genuine dispute requiring a trial. Morrison's claims are based on a mere scintilla of evidence–the undisputed evidence that Milner referred to Morrison as not being a good "fit" at another bank branch, which Morrison says she "concluded" referred to her race, the fact that she brought up that comment again in 2017, and the fact that she was fired a month later. This evidence is insufficient on its own to support her claims, for the reasons explained above, and is rendered altogether toothless by Fifth Third's proffered, nondiscriminatory explanation for its actions, to which Morrison's only response is "I didn't do it."

"Summary judgment is a critical moment for a non-moving party. It must 'respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial.'" *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893-94 (7th Cir. 2018) (quoting *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562,

568 (7th Cir. 2017)). "Inferences supported only by speculation or conjecture will not suffice." *Id*. (citing *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 721-22 (7th Cir. 2018)). "Neither will the mere scintilla of evidence." *Id*. (citing *Grant*, 870 F.3d at 571). On summary judgment this Court must decide "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Johnson*, 892 F.3d at 893-94 (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself. . . . Relevant evidence must be considered and irrelevant evidence disregarded." *Id*. In this instance, Morrison's evidence is insufficient to permit a reasonable jury from concluding that her race was the reason she was fired or that her firing was in retaliation for having complained about discrimination. Lacking such evidence, Morrison's case rests on conclusions (both factual and legal) and "[i]nferences supported only by speculation or conjecture[, which] will not suffice[]" to overcome summary judgment. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893-94 (7th Cir. 2018) (citing *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 721-22 (7th Cir. 2018)).

For the reasons explained above, the motion to strike filed by Plaintiff F. Renee Morrison (ECF No. 39) is DENIED; the motion to strike filed by Defendant Fifth Third Bank (ECF No. 46) is GRANTED in part and DENIED in part; and the motion for summary judgment filed by Fifth Third Bank (ECF No. 32) is GRANTED.[6]

---

[6] The Court reviewed Plaintiff's sur-response (ECF No. 52-1) and Defendant's sur-reply (ECF No. 57) and concluded that they raise no issues that affect the Court's analysis or conclusions.

Date: June 15, 2021.

/s/   William C. Lee
William C. Lee, Judge
U.S. District Court
Northern District of Indiana